# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| STATE OF FLORIDA<br>by Attorney General Bill McCollum | ) |
| | ) |
| STATE OF ARIZONA<br>by Attorney General Terry Goddard | ) |
| | ) |
| STATE OF ARKANSAS<br>by Attorney General Dustin McDaniel | ) |
| | ) |
| STATE OF CALIFORNIA<br>by Attorney General Edmund G. Brown, Jr. | ) |
| | ) |
| STATE OF CONNECTICUT<br>by Attorney General Richard Blumenthal | ) |
| | ) |
| DISTRICT OF COLUMBIA<br>by Interim Attorney General Peter J. Nickles | ) |
| | ) |
| STATE OF IDAHO<br>by Attorney General Lawrence G. Wasden | ) |
| | ) |
| STATE OF IOWA<br>by Attorney General Thomas J. Miller | ) |
| | ) Case No. 08-155 |
| STATE OF KANSAS<br>by Attorney General Stephen N. Six | ) |
| | ) |
| STATE OF MAINE<br>by Attorney General G. Steven Rowe | ) |
| | ) |
| STATE OF MARYLAND<br>by Attorney General Douglas F. Gansler | ) |
| | ) |
| COMMONWEALTH OF MASSACHUSETTS<br>by Attorney General Martha Coakley | ) |
| | ) |
| STATE OF MICHIGAN<br>by Attorney General Michael A. Cox | ) |
| | ) |
| STATE OF MINNESOTA<br>by Attorney General Lori Swanson | ) |
| | ) |

STATE OF MISSOURI                                  )
by Attorney General Jeremiah (Jay) W. Nixon        )
                                                   )
STATE OF NEVADA                                    )
by Attorney General Catherine Cortez Masto         )
                                                   )
STATE OF NEW YORK                                  )
by Attorney General Andrew M. Cuomo                )
                                                   )
STATE OF NORTH CAROLINA                            )
by Attorney General Roy Cooper                     )
                                                   )
STATE OF OHIO                                      )
by Attorney General Marc E. Dann                   )
                                                   )
STATE OF OREGON                                    )
by Attorney General Hardy Myers                    )
                                                   )
COMMONWEALTH OF PENNSYLVANIA                        )
by Attorney General Tom Corbett                    )
                                                   )
STATE OF SOUTH CAROLINA                            )
by Attorney General Henry McMaster                 )
                                                   )
STATE OF TEXAS                                     )
by Attorney General Greg Abbott                    )
                                                   )
STATE OF VERMONT                                   )
by Attorney General William H. Sorrell             )
                                                   )
STATE OF WASHINGTON                                )
by Attorney General Rob McKenna                    )
                                                   )
STATE OF WEST VIRGINIA                             )
by Attorney General Darrell V. McGraw, Jr.         )
                                                   )
                                                   )
                                    Plaintiffs,    )
                                                   )
                        v.                         )
                                                   )
ABBOTT LABORATORIES, FOURNIER                       )
INDUSTRIE ET SANTE, and                            )
LABORATOIRES FOURNIER, S.A.,                       )
                                                   )            JURY TRIAL DEMANDED
                                    Defendants.    )

## FIRST AMENDED COMPLAINT

The states of Florida, Arizona, Arkansas, California, Connecticut, Idaho, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Missouri, Nevada, New York, North Carolina, Ohio, Oregon, South Carolina, Texas, Vermont, Washington, West Virginia, the Commonwealths of Massachusetts and Pennsylvania, and the District of Columbia (collectively "Plaintiff States"), by their Attorneys General, on behalf of and/or for the benefit of their respective citizens and government entities, complain against Defendants Abbott Laboratories ("Abbott") and Defendants Fournier Industrie et Sante and Laboratoires Fournier, S.A., (collectively "Fournier") as follows:

### Nature of the Action

1.     Plaintiff States seek injunctive relief, penalties, damages, disgorgement and restitution for the Defendants' unlawful monopolization of the fenofibrate market. Abbott and Fournier feared that competition from generic manufacturers would significantly decrease prices for fenofibrate drugs and dilute their TriCor monopoly profits when consumers and state purchasers switched to lower-priced generic drugs. Once generic competition began, Abbott and Fournier knew that sales of TriCor would decline significantly.  As a result, they conspired to implement their anti-generic strategy.

2.     TriCor is a brand-name prescription drug that uses the active ingredient, fenofibrate, to regulate triglyceride and cholesterol levels. TriCor and other fenofibrate drugs lower triglyceride levels, reduce low-density lipoprotein cholesterol ("LDL" or "bad cholesterol"), and increase the levels of high-density lipoprotein cholesterol ("HDL" or "good cholesterol").  Fenofibrate drugs are prescribed for patients with

3

hypercholesterolemia (high bad cholesterol), hypertriglyceridemia (high triglycerides),
and mixed dyslipidemia (high bad cholesterol, high triglycerides, and low good
cholesterol). TriCor is a maintenance drug that is generally prescribed for long-term
cholesterol problems. Prescriptions for TriCor often provide numerous refills.

3. Since 1998, Abbott and Fournier have sold TriCor in the United States and
have conspired to maintain monopoly power in fenofibrate drugs by excluding generic
competition through improper means. As a result, consumers and state governments have
paid more for fenofibrate drugs while Abbott and Fournier enjoyed annual revenues from
TriCor sales that exceeded $1 billion.

4. Abbott and Fournier conspired to monopolize and implemented an anti-
generic strategy by orchestrating a scheme that involved:

a) Obtaining multiple patents through inequitable conduct, listing these
patents with the Food and Drug Administration, knowing they were
obtained improperly, and then filing sham patent litigation without a
reasonable basis to believe those patents were enforceable and/or were
infringed, for the purpose of delaying generic entry and foreclosing
competition in the market; and

b) Forcing the market to convert to new formulations before generic entry
by:

i. Reformulating TriCor with only minor changes to a form and
dosage strength, which did not provide any significant new clinical
benefit;

ii. Creating an artificial product differentiation to be used as a
marketing tool to convince physicians to stop writing prescriptions
for the old formulation and to write prescriptions only for the new
formulation;

iii. Stopping promotion and sales of the previous TriCor formulation
upon the introduction of the new formulation;

        iv.  Removing the old TriCor formulation from the market, so as to make it commercially unavailable by the time a generic competitor could enter the market, and

        v.  Interfering with the normal and customary channels of distribution used by generics to compete in the market.

5.     Abbott's and Fournier's anti-generic strategy was successful. When the patent litigations against the generic manufacturers of fenofibrate concluded, the old formulations of TriCor were no longer commercially available for any entering generic manufacturer to compete against. Abbott and Fournier have executed this on-going scheme to convert the fenofibrate market twice: first in 2001-2002, when they converted the market from TriCor 200mg capsules to TriCor 160mg tablets; and then in 2004-2005, when they converted the market from TriCor 160mg tablets to TriCor 145mg tablets. Moreover, Abbott and Fournier plan to continue their reformulation strategy for TriCor.

6.     Abbott's and Fournier's anti-generic scheme was designed and undertaken for the purpose of, and had the intended effect of, preventing generic substitution, foreclosing competition, and denying consumer choice.

7.     As a result of Abbott's and Fournier's anticompetitive conduct, consumers and state governments have been and continue to be deprived of the lower prices that generic competition brings, while Abbott and Fournier have continued to reap monopoly profits from the sale of TriCor.

8.     Furthermore, Abbott's and Fournier's conduct has been deceptive or unconscionable, has included unfair practices and/or unfair methods of competition, or has been otherwise unlawful under the consumer protection laws of certain of the Plaintiff States and has caused harm to those Plaintiff States, their governmental entities

and consumers by forcing them to pay more for fenofibrate than they otherwise would have in a competitive market.

## Jurisdiction & Venue

9.       Under 28 U.S.C. §§1331 and 1337, this Court has subject matter jurisdiction over the federal antitrust claims under the Sherman Act. This Court also has supplemental jurisdiction over the state law claims under 28 U.S.C. §1367 because those claims are so related to the federal claims that they form part of the same case or controversy. The exercise of supplemental jurisdiction avoids unnecessary duplication and multiplicity of actions and is in the interests of judicial economy, convenience, and fairness.

10.      Venue is proper in this district under 15 U.S.C. §22 and 28 U.S.C. §1391(b) and (c). Each Defendant resides, transacts business, committed an illegal or tortious act, or is found in this district, and a substantial part of the events giving rise to the claims arose in this district.

## Parties

11.      Defendant Abbott Laboratories is a corporation organized, existing and doing business under the laws of the State of Illinois. Its office and principal place of business is located at 100 Abbott Park Road, Abbott Park, Illinois. Abbott is engaged principally in the development, manufacture, and sale of pharmaceuticals and health care products and services throughout the United States.

12.      Defendant Fournier Industrie et Sante is a French corporation headquartered at 42, Rue de Longvic, 21300 Chenove, France. Formerly known as

6

Fournier Innovation et Synergie, Fournier Industrie et Sante was the holding company for a conglomerate of French and international companies.

13.    Defendant Laboratoires Fournier, S.A. is a wholly-owned French subsidiary of Fournier Industrie et Sante and is also headquartered at 42, Rue de Longvic, 21300 Chenove, France. Fournier Industrie et Sante and Laboratoires Fournier, S.A. collaborated with Abbott for regulatory approval, production, and sale of TriCor in the United States.

14.    Plaintiff States bring this action by and through their Attorneys General: (a) in their sovereign capacities as representatives and/or for the benefit of natural persons and/or as parens patriae of natural persons under state or federal law; (b) as parens patriae in their sovereign capacities to redress injury to their respective states' general economies; (c) in their sovereign and/or proprietary capacities, which may include state departments, bureaus, agencies, political subdivisions, and other instrumentalities as purchasers (either directly, indirectly, or as assignees), based on purchases of TriCor; and/or (d) as the chief law enforcement agency or other enforcement agency of each state to the extent that violations of the states' antitrust and consumer protection laws and regulations are alleged herein.

## Relevant Market

15.    The relevant product market is any drug with fenofibrate as the active ingredient. Fenofibrate has a unique therapeutic effect on cholesterol and triglyceride levels and differs from other lipid-regulating drugs such that they are not reasonably interchangeable. The fenofibrate market includes TriCor and generics that can be substituted.

7

16.    The relevant geographic market is the United States.

17.    At all relevant times, Abbott and Fournier enjoyed a market share in the United States fenofibrate market between 90% and 100%.

## Trade and Commerce

18.    Since May 1998, TriCor has been sold in interstate commerce throughout the United States.

19.    TriCor has been transported across state lines and has been sold in each of the Plaintiff States. Abbott's and Fournier's unlawful activities alleged in this Complaint have occurred in and have had a substantial effect upon interstate commerce. Abbott's and Fournier's annual revenues for TriCor sold in the U.S. have surpassed $1 billion.

## Factual Background

### I.    The Hatch-Waxman Act

20.    The manufacture and commercial sale of pharmaceutical drugs are regulated by the Food and Drug Administration ("FDA") under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §301, *et seq*. The manufacturer of a new drug must submit a new drug application ("NDA") that demonstrates, among other things, a drug's safety, clinically-proven effectiveness, composition, and patent coverage.

21.    To speed the entry of generic drugs and to facilitate price competition with branded drugs, Congress passed the Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman Act"). Under the Hatch-Waxman Act, generic drug manufacturers may receive FDA approval for generic drugs without replicating costly and time-consuming clinical trials. Instead, a generic drug manufacturer may submit an

abbreviated new drug application ("ANDA") and incorporate data, such as clinical studies, that the NDA filer submitted to the FDA. To be approved, an ANDA must demonstrate that the generic drug has the same active ingredients as, is pharmaceutically equivalent to, is bioequivalent to, and has the same labeling as the previously approved drug. The FDA publishes a list of all approved drugs and therapeutically equivalents in the *Approved Drug Products with Therapeutic Equivalence Evaluations* (commonly referred to as the "Orange Book").

22.     The Orange Book also lists all patents, if any, covering an approved drug. If the ANDA applicant seeks approval to market a drug before the expiration date of one or more of the patents listed in the Orange Book, the ANDA applicant must certify that each patent "is invalid, unenforceable or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted." 21 U.S.C. §355 (j)(2)(A) (vii)(IV). This is commonly referred to as a Paragraph IV Certification. An ANDA applicant must also notify the patent owner and NDA holder of the Paragraph IV Certification and provide a written statement of the reasons each patent is not infringed, is invalid, or is unenforceable.

23.     Upon receipt of the Paragraph IV notice, a patent holder or NDA holder that believes the generic will infringe a valid and enforceable patent may sue the ANDA applicant for patent infringement. If such an action is brought within 45 days from receipt of that notice, the FDA is precluded from granting final approval of the ANDA until the earlier of: 1) 30 months from the receipt of the Paragraph IV notice; 2) the date on which the court holds the patent is invalid, not infringed, or unenforceable; or 3) the date on which the case is withdrawn, discontinued, dismissed, or otherwise terminated by

the patent holder or NDA holder. This time period is often referred to as a "30-month stay." If the patent holder or NDA holder does not file a patent infringement action within the 45-day period, the FDA may grant final approval of the ANDA, if the FDA's other regulatory requirements are satisfied.

## II.    Generic Substitution

24.    In most States and under most health plans, a pharmacist may substitute a generic drug for a prescribed brand name drug when the FDA has given the generic drug an AB rating to that branded drug.

25.    An AB rating requires the generic drug to be both pharmaceutically equivalent and bioequivalent to the branded drug. The FDA considers a drug product to be a pharmaceutical equivalent if the drug contains the same active ingredient; is of the same dosage, form, and route of administration; and is identical in strength. The FDA considers a drug product bioequivalent if the drug shows comparable bioavailability, which is the rate and extent that the active ingredient is absorbed from the drug product when studied under similar experimental conditions.

26.    Once the FDA approves an ANDA for a generic drug and determines it is AB-rated to the branded drug, state laws govern how the generic drug may be substituted for the brand name drug prescribed by physicians. Generally, state laws permit pharmacists to substitute an AB-rated generic drug for the brand name drug, unless there is a doctor or patient request otherwise.

### III.    Insurance Coverage and Patient Co-Pays

27.    While some patients are responsible for the full cost of prescription drugs, health plans, insurers and other third-party payors pay most of the direct costs of acquiring prescription drugs and use various means to control costs, including a formulary. A formulary is a list of preferred drugs that a payor predetermines that it will cover for its enrollees. Formularies can be open, closed or incentive-based. An incentive-based formulary generally tiers the drugs on the formulary by preference and charges enrollees the lowest co-pay for drugs from the first tier.

28.    Healthcare insurers and other third parties who pay for prescription medications use private databases, like First DataBank's National Drug Data File ("NDDF"), to access prescription drug descriptions and pricing data, to identify AB-rated drugs and to obtain other information about FDA-approved drugs. For example, the NDDF uses a "Generic Indicator" code to identify whether a drug is a "single-source product" (i.e. the drug is supplied by only one company), or whether it is a "multi-source product" (i.e. the drug is supplied by multiple companies). Identifying a drug as a "multi-source product" indicates that an AB-rated generic drug is available.

29.    Brand-name drug manufacturers can manipulate the NDDF to restrain generic competition. For example, if a manufacturer's reference number or NDC number for the branded drug is removed from the NDDF, the branded drug is no longer listed in that database. The branded drug would no longer be linked to any generic that obtains an AB-rating to the branded drug. A later-listed generic then would be identified as a single source product, causing insurers and other payors to classify the intended generic drug as

a branded product and either not cover it or charge patients higher co-pays for it. The result is that it is less likely that the generic drug will be either dispensed or purchased.

30.     Similarly, the removal of the reference to the branded drug and/or the NDC number would impede a pharmacist's ability to advise the consumer that an AB-rated generic drug is available, or to contact the consumer's physician to suggest the physician re-write a prescription for that generic. Thus, manufacturers can manipulate the availability of important information that third-party payors and pharmacists frequently rely on, causing normal channels of distribution for generic manufacturers to be disrupted, if not entirely foreclosed.

## Abbott's and Fournier's Anticompetitive Conduct

### I.     Abbott's and Fournier's First TriCor Switch

#### A.     Abbott and Fournier Developed an Anti-Generic Strategy

31.     Fournier received FDA approval in 1993 for a fenofibrate drug called Lipidil. Fournier did not market Lipidil in the United States so it sought and found an experienced, United States-based collaborator: Abbott. In January 1998, Abbott and Fournier reached an agreement under which Fournier licensed to Abbott the rights to sell Fournier's fenofibrate drug in the United States. Since then, Abbott and Fournier have been collaborators in developing and marketing fenofibrate drugs in the United States under the brand name TriCor.

32.     In February 1998, Fournier received FDA approval to sell 67mg TriCor capsules to treat high triglyceride levels, and later Abbott received FDA approval to sell TriCor capsules at 134mg and 200mg strengths (collectively "TriCor 200mg Capsules").

33.     Abbott and Fournier expected that generic competition could occur within two to three years after the launch of TriCor 200mg Capsules. They feared that if an AB-rated generic fenofibrate drug reached the market, substitution would occur and TriCor's market share would fall significantly.

34.     Shortly after Abbott introduced TriCor in the United States, Abbott and Fournier began developing a sophisticated scheme to unlawfully thwart generic competition and maintain their monopoly in the fenofibrate market. Abbott and Fournier executives discussed how to exclude and defeat generic competition for TriCor. They agreed that the number one priority was to develop an anti-generic strategy and changing TriCor's formulation was critical to forestall generic competition.

35.     Abbott and Fournier agreed to an anti-generic strategy that included enforcing multiple patents with the knowledge that the patents were not infringed. This strategy was intended to generate enough time to introduce a reformulated TriCor product so that any generic competition would be foreclosed. Abbott and Fournier used the 30-month stay triggered by their patent litigation to ensure that they had sufficient time to launch the new formulation, to force the market to convert to it and to withdraw the prior formulation from the market. This left consumers, physicians, pharmacists and third-party payors with no choice but to use the reformulated product. Abbott and Fournier planned to switch the market to a reformulated TriCor product every few years, thereby creating a "moving target" for generic manufacturers.

**B.** **Abbott and Fournier Used Patent Litigation to Create Time to Reformulate TriCor**

36.    Fournier obtained U.S. Patent No. 4,895,726 ("'726 Patent"), which was listed in the FDA's Orange Book for TriCor 200mg Capsules.

37.    In December of 1999, a generic manufacturer, Novopharm Ltd., which was later acquired by Teva Pharmaceuticals USA, Inc., (collectively known as "Teva") filed an ANDA with the FDA seeking approval of a generic version of TriCor 200mg Capsules. Pursuant to the Hatch-Waxman Act, Teva submitted a Paragraph IV notice for each strength to Abbott stating that its generic capsules did not infringe the '726 Patent. As part of their anti-generic scheme, after receiving Teva's three Paragraph IV notifications, Fournier and Abbott filed three baseless patent infringement suits against Teva claiming infringement of the '726 Patent, triggering a 30-month stay and delaying the FDA's approval of Teva's generic fenofibrate capsules.

38.    In May of 2000, Impax Laboratories, Inc. ("Impax") also filed an ANDA for generic fenofibrate capsules and submitted a Paragraph IV Certification stating that its formulation for a generic capsule did not infringe the '726 Patent. After receiving Impax's Paragraph IV notice, Fournier and Abbott filed a baseless patent infringement suit against Impax claiming infringement of the '726 Patent, triggering a 30-month automatic stay and delaying the FDA's approval of Impax's generic fenofibrate capsules.

39.    The claims contained within the '726 Patent require, among other things, that fenofibrate be co-micronized with a solid surfactant in the absence of any excipients. Because the '726 Patent claims require co-micronization of the fenofibrate and solid surfactant in the absence of excipients, and Teva's and Impax's Paragraph IV notifications expressly indicated they did not use that process, Abbott and Fournier had

14

no basis to sue nor to continue to prosecute their suits against Teva and Impax by
asserting that their capsule ANDAs infringed the '726 Patent. These suits began a pattern
of Abbott and Fournier filing baseless patent lawsuits against Teva and Impax.

40.     On March 19, 2002, the District Court granted summary judgment for
Teva finding it did not infringe the '726 Patent. Two weeks later the FDA granted final
approval of Teva's ANDA for two of the capsule strengths, and by September 2002, the
FDA had granted approval for all strengths of Teva's generic fenofibrate capsules.
Summary judgment of noninfringement was also later granted in favor of Impax. The
Court of Appeals for the Federal Circuit later affirmed the summary judgment in favor of
Teva, stating that "there can be no dispute that fenofibrate and a solid surfactant are not
'co-micronized' as that term is used in the '726 Patent."

41.     Abbott's and Fournier's purpose in filing and maintaining these patent
infringement suits against Teva and Impax, both separately and as part of their overall
scheme, was to trigger a series of 30-month automatic stays to delay FDA approval of
and Teva's and Impax's entry into the market with a generic version of TriCor capsules
to interfere with their ability to introduce generic fenofibrate capsules and to compete
with TriCor.

## C.    Abbott and Fournier Forced the Market to Switch to TriCor 160mg Tablets

42.     During the 30-month stays, triggered by their lawsuits, Abbott and
Fournier successfully forced the market to switch to TriCor tablets before competition
from generic fenofibrate capsules could begin to erode their monopoly position in the
fenofibrate market.

1.    **The Reformulation: Abbott and Fournier Reformulated
TriCor to Avoid Competition from an AB-Rated Drug and to
Justify their Marketing Campaign**

43.    While delaying generic entry by filing their patent infringement litigation,

Abbott and Fournier executed the rest of their strategy to convert the market to a new

formulation of TriCor.

44.    Abbott and Fournier executed this strategy by making minor changes to

TriCor 200mg Capsules, which had no new clinical benefit, to facilitate marketing the

next formulation of TriCor to doctors, pharmacists, health insurers and third-party payors.

45.    During the FDA review of Abbott's NDA, Abbott submitted data to show

that the formulation in TriCor 160mg Tablets could raise HDL, or good cholesterol

levels. The FDA approved this additional indication for HDL, permitting Abbott to

include it on the label for TriCor 160mg Tablets and in their marketing materials.

46.    In reality, TriCor 160mg Tablets and TriCor 200mg Capsules had the

same effect on HDL. Abbott's data demonstrating this effect came from the same

Fournier studies previously submitted to the FDA for TriCor 200mg Capsules. This HDL

indication could have been sought for TriCor 200mg Capsules. Instead, Abbott and

Fournier chose to delay that request to artificially differentiate TriCor 160 mg Tablets

from TriCor 200mg Capsules.

47.    TriCor 160mg Tablets were not AB-rated to TriCor 200mg Capsules or

any generic fenofibrate capsules. While the reformulated TriCor 160mg Tablets were

bioequivalent to TriCor 200mg Capsules, the tablets had a different dosage and a

different form and were not pharmaceutical equivalents. This change in dosage and form

precluded an AB rating for TriCor 160mg Tablets and TriCor 200mg Capsules or any

AB-rated generic 200mg capsules. As a result, pharmacists could not substitute TriCor 160mg Tablets with any generic fenofibrate capsules, including those for which Teva and Impax would obtain FDA approval.

48.     While Abbott's new formulation thwarted the AB-rating, the FDA did not recognize these changes as clinically or therapeutically significant. Abbott's own managers and scientist viewed the capsule and tablet formulations to be clinically and therapeutically equivalent. Moreover, Abbott priced TriCor 160mg Tablets the same as TriCor 200mg Capsules, reflecting that Abbott viewed them as clinically equivalent.

49.     In switching from capsules to tablets, Abbott and Fournier changed TriCor's labeling, but not its efficacy and safety for consumers. Abbott and Fournier could promote an indication for raising HDL levels as "new" but, in fact, the effect was not "new" because there was no demonstrated change in efficacy between TriCor 200mg Capsules and TriCor 160mg Tablets.

### 2.     The Switch: Abbott Launched a Marketing Blitz

50.     A cornerstone of Abbott's and Fournier's marketing strategy was to convince physicians, health insurers, pharmacists and consumers that TriCor 160mg Tablets had an advantage over TriCor 200mg Capsules. The "new" HDL indication on the label for TriCor 160mg Tablets allowed Abbott to have a new marketing spin for them. A majority of physicians were already aware that TriCor—in capsules or tablets— could raise HDL levels. As a result, the HDL label change was expected to have little-to-no impact on Abbott's sales of TriCor 160mg Tablets.

51.     Abbott and Fournier launched an aggressive marketing campaign to promote TriCor 160mg Tablets to physicians, pharmacists, insurers and third-party

payors. Abbott's sales force canvassed key TriCor prescribers to convince physicians to write all prescriptions and refills for TriCor 200mg Capsules for the newly reformulated TriCor 160mg Tablets.

52.    Abbott was concerned that if insurers and other third-party payors thought the switch to TriCor 160mg Tablets was a strategy to deter generic competition, they might not place TriCor 160mg Tablets in a preferred position in their formularies. Abbott's sales force thus took extra measures to meet with insurers and payors to convince them to list the reformulated TriCor 160mg Tablets as a preferred drug on the formulary.

53.    Additionally, as part of Abbott's and Fournier's plan, they sent Abbott's sales force to retail pharmacies to discourage them from stocking any fenofibrate drugs other than TriCor 160mg Tablets. Defendants undertook this tactic to deter generic entry and retain their monopoly on fenofibrate.

54.    To further persuade physicians and pharmacists to prescribe and stock TriCor 160mg Tablets, Abbott informed them that they were discontinuing TriCor 200mg Capsules.

### 3.    The Forced Conversion: Abbott and Fournier Discontinued Sales and Production of TriCor 200mg Capsules

55.    As part of their strategy to rapidly convert TriCor purchasers from capsules to tablets prior to the entry of generic competition, Abbott and Fournier planned to discontinue all production, sales and promotion efforts for TriCor 200mg Capsules, and instead to focus all sales and promotional efforts on TriCor 160mg Tablets.

56. To accelerate the switch from capsule to tablet formulations, Fournier stopped manufacturing TriCor 200mg Capsules. At the same time, Abbott stopped taking orders and began withdrawing the Capsules from the market.

### 4. The Purge: Abbott Reclaimed TriCor 200mg Capsules

57. In addition to ceasing sales, Abbott and Fournier sought to ensure that the existing inventory of TriCor 200mg Capsules at wholesalers' warehouses and/or on pharmacy stores' shelves was removed so that neither refills nor new prescriptions could be filled due to lack of supply.

58. Abbott sought to recover existing inventories of TriCor 200mg Capsules in an effort to purge the market of TriCor 200mg Capsules prior to any generic entry. Abbott and Fournier took this extra step because they realized that if TriCor 200mg Capsules were available, especially for refills, there could be no forced conversion to TriCor 160mg Tablets.

59. Abbott's and Fournier's plan was to contact wholesalers and large retailers and to offer to exchange TriCor 200mg Capsules for the reformulated TriCor 160mg Tablets. Abbott's plan was to accept capsules in exchange for tablets as well as credits. In doing so, Abbott deviated from its standard return policy in order to expedite the removal of TriCor 200mg Capsules from the market. After recovering TriCor 200mg Capsules, Abbott destroyed the capsules.

60. Abbott's and Fournier's forced conversion strategy was successful. By the end of February 2002, Abbott had killed TriCor 200mg Capsules.

5.    **The Final Nail: Abbott and Fournier Interfered with the Normal and Customary Methods Generics Use to Compete**

61.    By effectively purging the market of TriCor 200mg Capsules, Abbott and Fournier prevented pharmacists from substituting generic fenofibrate capsules, thereby effectively forcing the market to TriCor 160mg Tablets.

62.    To further protect their fenofibrate monopoly against generic competition, Abbott and Fournier also sought to eliminate incentives for consumers to ask physicians to re-write TriCor prescriptions for capsules so generic fenofibrate capsules could be dispensed. Abbott accomplished this by manipulating a dominant source of information relied upon by the medical community: First DataBank's NDDF. By April 2002, shortly after Abbott had completed the switch to tablets, but before the generic capsules became available, Abbott instructed First DataBank to delete the NDC number for all TriCor capsules in its NDDF database. The removal of the reference for TriCor 200mg Capsules, including its NDC number, prevented pharmacists from identifying any AB-rated generic substitute in First DataBank's NDDF. Thus, due to Abbott's manipulation of the NDC number for TriCor 200mg Capsules in the NDDF, when Teva launched generic fenofibrate capsules in mid-2002, they were the only fenofibrate capsule listed in the NDDF and were coded as a single-source drug, not as a generic.

63.    As a single-source drug in the NDDF, Teva's fenofibrate capsules generally were not afforded the preferred formulary status given generic drugs. Some insurers did not add Teva's generic capsules to their drug formularies and refused to pay for them at all. Other health insurers charged a higher co-pay than typically charged for a generic. As a result, Abbott prevented incentives for patients to request their TriCor 200mg Capsule prescriptions be rewritten for Teva's generic capsules.

20

64.    With no opportunity to substitute TriCor prescriptions and scant incentive for patients or pharmacists to purchase generic fenofibrate capsules, there was little demand for generic fenofibrate capsules. Not surprisingly, potential manufacturers of generic fenofibrate capsules had little interest in entering the market.

**D.    Abbott's and Fournier's Anti-Generic Strategy was Successful**

65.    Abbott's and Fournier's efforts to force the market to convert were successful. By March 2002, most prescriptions for TriCor were for TriCor 160mg Tablets.

66.    As a result, Abbott's and Fournier's reformulation and forced conversion strategy succeeded in thwarting generic fenofibrate entry. While most generic launches capture a large percentage of the market within weeks, when Teva launched generic fenofibrate capsules in mid-2002, Abbott and Fournier had already switched the market. As a result, more than a year after Teva's generic capsules came to market, generic fenofibrate drugs accounted for fewer than 2% of all fenofibrate prescriptions in the United States. Moreover, Impax, after obtaining FDA approval for its fenofibrate capsule, which were AB-rated to TriCor 200mg Capsules, never attempted to enter the market.

67.    Substitution laws did not allow pharmacists to substitute a generic capsule to fill a prescription written for TriCor 160mg Tablets. The outcome was that purchasers, including consumers, state governments, and third-party payors were required to pay supracompetitive prices for TriCor 160mg Tablets and effectively denied the cost advantages of a competing generic drug.

21

## II.    Abbott's and Fournier's Second TriCor Switch

68.    Even as Abbott and Fournier prevented competition from generic

fenofibrate capsules, they also conspired to extend their anti-generic strategy to defeat

anticipated generic competition for TriCor 160mg Tablets.

69.    Abbott and Fournier undertook the same strategy they used to defeat entry

of generic fenofibrate capsules. They improperly obtained several patents, and knowing

these patents were unenforceable, submitted them to the FDA to be listed in the Orange

Book. Then, Abbott and Fournier filed baseless patent infringement litigation to obtain

30-month stays barring FDA approval of the generics' ANDAs. During those stays,

Abbott launched a reformulated TriCor product, and followed that launch with a market

switch from TriCor 160mg Tablets to the reformulated TriCor 145mg tablets. Abbott

also reclaimed any remaining TriCor 160mg Tablets as quickly as possible, so as to

complete the conversion of the fenofibrate market before entry of any generic 160mg

tablets. Finally, Abbott caused any reference to TriCor 160mg Tablets, including the

NDC number, to be deleted, interfering with the normal and customary channels of

distribution used by generic competitors. As a result, when the patent-based tablet

litigation resulted in summary judgment for the generic manufacturers and was otherwise

dismissed by Abbott and Fournier, terminating the 30-month stay blocking FDA approval

of the ANDAs, there were no commercially available TriCor 160mg Tablets remaining.

### A.    The Stamm Patents Were Improperly Obtained

70.    Fournier filed and prosecuted the applications for U.S. Patent Nos.

6,074,670 ("'670 Patent"), 6,277,405 ("'405 Patent"), 6,589,552 ("'552 Patent"), and

6,652,881 ("'881 Patent") (collectively, "Stamm Patents"), and communicated with Abbott concerning the prosecution of the Stamm Patents before the PTO.

71.    Fournier committed inequitable conduct before the PTO by intentionally failing to disclose highly material data in the Stamm applications and supporting declarations, the omission of which caused the data presented to be misleading. Moreover, in response to the PTO's initial determination that the Stamm Patents were unpatentable due to the prior art, including its own '726 Patent, Fournier intentionally and knowingly relied on the misleading data to argue that the applications were patentable due to superior and unexpected dissolution rates. Fournier knew that the dissolution rates of the various fenofibrate compositions being claimed in the applications for the Stamm Patents were critical to the patentability of those compositions.

72.    In its applications for each of the Stamm Patents, Fournier represented to the PTO that the fenofibrate formulations had "unexpectedly" faster dissolution rates than that of earlier fenofibrate products and patents, including its own '726 Patent. Fournier represented to the PTO that the dissolution and bioavailability of fenofibrate compositions created in accordance with the '726 Patent were "incomplete due to the poor hydrosolubility of fenofibrate." In contrast, Fournier claimed that the Stamm formulations achieved a "superior" dissolution of greater than "10% in 5 minutes, 20% in 10 minutes, 50% in 20 minutes and 75% in 30 minutes."

73.    To convince the PTO that the Stamm formulations dissolved faster than the earlier '726 Patent, Fournier presented the PTO with tests that purported to compare the dissolution of two 100mg tablets of the Stamm formulations with TriCor 200mg Capsules made using the '726 Patent.

23

74.    Fournier represented to the PTO that the test results "clearly showed the composition, according to the [Stamm] invention, has a dissolution profile which is distinctly better [faster] than that of the prior art compositions."

75.    But at the time that Fournier made these representations to the PTO, Fournier had other data, which it did not disclose to the PTO, showing that TriCor 200mg Capsules had faster dissolution rates than were represented. Some of the new data showed that TriCor 200mg Capsules dissolved just as fast, if not faster, than the supposedly "unexpectedly superior" dissolution results claimed in the Stamm applications.

76.    Specifically, Fournier failed to disclose to the PTO two sources of data that contradicted its assertions of "unexpectedly superior" dissolution results. First was a May 30, 1997, memorandum by a Fournier employee, Pascale Blouquin, ("Blouquin Memo") that revealed dissolution tests performed pursuant to the '726 Patent. The Blouquin Memo reported dissolution results of Lipanthyl 200M (later marketed as TriCor 200mg Capsules) in a medium of .025 sodium lauryl sulfate that were even faster than dissolution results  presented to the PTO in the Stamm applications. Second, Fournier documents also contained dissolution data for TriCor 67mg capsules that were as fast as the dissolution rates claimed in the Stamm applications, except for the 5 minute interval. None of these tests were disclosed at the time Fournier was prosecuting the Stamm Patent applications.

77.    Additionally, a declaration submitted by Philippe Reginault, a Fournier employee, in support of the Stamm applications, also failed to disclose these sources. Reginault's sworn declaration, submitted in support of the Stamm Patent application that

resulted in the issuance of the '881 Patent, failed to disclose data despite his affirmation

that he knew and understood that he had a duty to disclose all material information when

providing submissions to the PTO during prosecution of a patent application.

78.     As Fournier's director of pharmaceutical development between 1988 and

2002, Reginault was intimately involved in Fournier's fenofibrate formulation and

analytical development projects.  In 2002, Reginault became Fournier's director of

pharmaceutical technologies evaluation and continued his involvement with Fournier's

fenofibrate projects.  Moreover, it was Reginault who was instrumental to Fournier using

patents to delay generic competition and was Fournier's primary technical contact with

Abbott.

79.     The PTO initially rejected all of the Stamm Patent applications on the

grounds that the fenofibrate formulations claimed in those applications were too similar

to and not patentably different from the formulations claimed in the '726 Patent and other

earlier patents.  Fournier disputed the PTO's rejections, citing and relying on the

misleading data to argue that the formulations in the Stamm Patent applications had a

surprisingly and unexpectedly faster dissolution rate, and hence should be patented.

Fournier repeatedly cited in each Stamm Patent application the misleading comparisons

of the dissolution rates of the earlier fenofibrate products with those being claimed in the

"new" invention.  Fournier continued to withhold the material data showing faster

dissolution rates for earlier products and patents throughout the prosecution of the Stamm

Patents to overcome rejections based on the '726 Patent and other earlier patents.  At no

time during the prosecution of the Stamm Patents did Fournier disclose the data that was

less favorable to, and indeed contradicted, its argument that the Stamm Patents produced

a formulation with dissolution results superior to those reflected in earlier patents. Instead, Fournier continued to rely on the misleading data in arguing that the Stamm applications were patentable and non obvious.

80.    In issuing the Stamm Patents, the PTO relied upon Fournier's continued use of and reference to the misleading data on unexpected, superior dissolutions of the Stamm formulations.

81.    The data withheld by Fournier and Reginault was highly material both in view of (1) Fournier's original arguments that the Stamm Patents were different from the prior art in the '726 Patent and other patents due to an allegedly faster dissolution profile in each of the four Stamm Patents, and (2) Fournier's other arguments made during prosecution to overcome rejections based on prior art, including the '726 Patent.

82.    The material information was withheld and the misleading declaration was submitted by Fournier and Reginault with intent to deceive the PTO. Fournier and Reginault made misleading representations and withheld highly material information with the intent and objective of inducing the PTO to issue the Stamm Patents. Each of the Stamm Patents is tainted by inequitable conduct and thus none of the Stamm Patents are enforceable.

83.    Fournier's overall purpose in obtaining each of the Stamm Patents was to prohibit or delay generic competition for TriCor. Fournier's repeated misstatements and failures to disclose highly material information was part of Fournier's and Abbott's single, overall coordinated scheme, and evidenced their intent to deceive the PTO for the purpose of wrongfully excluding competition.

26

84.    Fournier and Abbott intended to and did deceive the PTO because they knew that by obtaining any patent that claimed fenofibrate, they could improperly submit those patents to the FDA to be listed in the Orange Book. This would force any ANDA filer to file a Paragraph IV Certification, opening the door to infringement litigation that would trigger a 30-month stay of the FDA's approval of the ANDA, regardless of the strength of the patent or the outcome of the patent litigation.

**B.    Abbott and Fournier Abused the Hatch-Waxman Regulatory Scheme by Having Unenforceable Patents Listed in the Orange Book**

85.    The Stamm Patents were issued by the PTO at various times beginning on June 13, 2000, through November 25, 2003. Upon issuance, each Stamm Patent was listed in the Orange Book. Because Abbott and Fournier knew that the Stamm Patents were unenforceable, they unlawfully impeded generic entry by listing each of the Stamm Patents in the FDA's Orange Book.

86.    Because of the Orange Book listing, Teva and Impax were required to file ANDAs with Paragraph IV Certifications, asserting that each patent was unenforceable, invalid or not infringed by their generic fenofibrate tablet. Abbott and Fournier intended to and knew that by listing the unenforceable Stamm Patents in the Orange Book, Teva and Impax and other potential generic entrants would be required to file Paragraph IV Certifications as to each of the Stamm Patents. They also knew that any infringement litigation would automatically trigger multiple 30-month stays preventing FDA approval of Teva's and Impax's ANDA applications for generic fenofibrate tablets.

87.    The listing of the Stamm Patents in the Orange Book was in furtherance of Abbott's and Fournier's overall scheme to monopolize and block generic competition in

the fenofibrate market. As a result of the wrongful listing of the Stamm Patents in the Orange Book, Abbott was able to obtain multiple 30-month stays on the FDA's approval for generic 160mg fenofibrate.

88.    Obtaining several of the Stamm Patents by inequitable conduct was a component of Abbott's and Fournier's overall anticompetitive scheme. Standing alone, having the unenforceable Stamm Patents listed in the Orange Book was also a wrongful and unreasonable restraint on trade.

## C.    Abbott's and Fournier's Lawsuits were Baseless as the Stamm Patents were Unenforceable and they had No Reasonable Basis to Believe there was Infringement

### 1.    The Tablet Lawsuits

89.    Less than a year after Abbott and Fournier launched TriCor 160mg Tablets, generic manufacturers began filing ANDAs with the FDA seeking approval to launch generic versions of fenofibrate tablets. Along with filing the ANDAs, the generic manufacturers certified that their products did not infringe the '726, '670 and '405 Patents that Abbott and Fournier had listed in the FDA's Orange Book for its TriCor 160mg Tablet.

90.    After Teva and Impax provided their Paragraph IV notices, Abbott and Fournier commenced three lawsuits against Teva and Impax in the District of Delaware (Civil Action No. 02-1512 filed on October 4, 2002; Civil Action 03-120 filed on January 23, 2003; and Civil Action No. 03-0288 filed on March 14, 2003) ("Original Tablet Lawsuits"), alleging that Teva infringed the '726, '670 and '405 Patents and that Impax infringed the '670 and '405 Patents. These suits triggered 30-month stays of the FDA's approval of Teva's and Impax's ANDAs.

91.     In July of 2003, the PTO granted Fournier a new patent, the 6,589,552

("'552 Patent"), which was a continuation of the '670 and '405 Patents. Abbott and

Fournier promptly listed the '552 Patent in the Orange Book.

92.     Teva and Impax then submitted new Paragraph IV Certifications for the

'552 Patent and notified Abbott and Fournier that their ANDAs did not infringe the '552

Patent.

93.     Starting in August of 2003, Abbott and Fournier filed additional tablet

patent infringement lawsuits against Teva and Impax in the District of Delaware,

including Civil Action No. 03-847 on August 29, 2003, and Civil Action No. 03-890 on

September 22, 2003, alleging that their respective requests to the FDA for approval of

their Tablet ANDAs infringed the '552 Patent ("'552 Lawsuits").

94.     Again, Abbott's and Fournier's newly filed '552 Lawsuits triggered

additional 30-month stays that prohibited the FDA from granting final approval of Teva's

or Impax's Tablet ANDAs.

95.     In November of 2003, Fournier was granted yet another patent from the

Stamm Patent applications, U.S. Patent No. 6,652,881 ("'881 Patent") which Abbott

promptly listed in the Orange Book.

96.     Teva and Impax then submitted Paragraph IV notices for the '881 patent

and, in response, Abbott and Fournier filed yet another round of tablet patent

infringement lawsuits in the District of Delaware against Teva and Impax including Civil

Action no. 04-0047 on January 22, 2004, and Civil Action no. 04-0048 on January 22,

2004 ("'881 Lawsuits").

### 2.    All the Tablet Lawsuits were Baseless and Brought for the Purpose of Preventing Generic Competition, and all were Ultimately Dismissed

97.    Each and every lawsuit brought by Abbott and Fournier asserting infringement of the Stamm Patents by Teva's and Impax's tablet formulations (the "Tablet Litigation") were baseless because Fournier obtained all of the Stamm Patents through inequitable conduct as described supra. Thus, at the time that Abbott and Fournier filed each of their infringement actions enforcing all of the Stamm Patents, and/or during the time that they maintained these suits, they lacked a reasonable basis to believe that Teva's and Impax's ANDAs for generic fenofibrate tablets infringed valid and enforceable patents.

98.    In bringing and maintaining the Tablet Litigation, Abbott and Fournier also lacked a reasonable basis for alleging that Teva's and Impax's ANDAs for generic fenofibrate tablets infringed the '726 Patent and the Stamm Patents, or any one of them. In addition, Abbott and Fournier never had any objective basis for alleging that Teva's or Impax's Tablet ANDAs or their fenofibrate tablets infringed any of the asserted Stamm Patents because they failed to make a good faith analysis of Impax's and Teva's products and product specifications to determine whether they contained all the elements asserted in each of the Stamm Patents, including the weight limitation. Abbott and Fournier also failed to consider facts and information that Teva and Impax had made known to Abbott and Fournier prior to the filing of the Tablet Litigation. Finally, Abbott and Fournier failed to consider highly relevant and material information Teva and Impax gave them in response to discovery requests during the Tablet Litigation.

30

99.    As previously discussed, Abbott and Fournier sued both Impax and Teva for allegedly infringing the '726 Patent after they sought FDA approval to market fenofibrate capsules (the "Capsule Litigation"). During Abbott's and Fournier's prosecution of the Tablet Lawsuits, Abbott and Fournier knew, as a result of the District Court decision in the Capsule Litigation, that they had no basis for alleging that Teva's fenofibrate tablets infringed the '726 Patent. Clearly, Teva's tablets did not infringe the '726 Patent for the same reasons the court found in the Capsule Litigation that Teva's capsules did not infringe.

100.    Moreover, the Federal Circuit's decision in the Capsule Litigation dated March 20, 2003, further confirmed that Abbott and Fournier had no basis for alleging that Teva's fenofibrate tablets infringed the '726 Patent, or for maintaining any action against Teva for infringement of the '726 Patent. Had Abbott and Fournier dismissed their claims against Teva concerning the '726 Patent, as they should have, any automatic stay caused by litigation over the '726 Patent would have been lifted.

101.    In addition, the Tablet Lawsuits were baseless in that there was no reasonable basis to believe that the products of Teva and Impax met the other claims limitations of the '670, '726 and '405 Patents as further discussed infra.

102.    Teva's and Impax's alleged infringement of the claims of the '670, '405 and '552 Patents rested, in part, on Abbott's and Fournier's proffered interpretation of the patent term "hydrophilic polymer." Abbott's and Fournier's asserted interpretation was directly inconsistent with, and contrary to, the definition of "hydrophilic polymer" explicitly recited in the Stamm Patents themselves. No reasonable litigant objectively and subjectively could have expected to prevail on the claim interpretation of the term

31

"hydrophilic polymer" that Abbott and Fournier asserted in the Original Tablet and the '552 Lawsuits. In the Original Tablet and the '552 Lawsuits, the Court rejected Abbott's and Fournier's proffered interpretation of the term "hydrophilic polymer" and noted that "the specification [in the Stamm Patents] clearly defines the term" in a manner inconsistent with Abbott's and Fournier's proffered interpretation.

103.     The court granted summary judgment of non-infringement of the '670 Patent, claim 9 of the '405 Patent, and the '552 Patent in Teva's and Impax's favor based on the proper interpretation of "hydrophilic polymer."

104.     The Tablet Lawsuits, both individually and as a pattern and as part of their overall anti-generic scheme, were brought by Abbott and Fournier intentionally and solely for the purpose of delay and to preclude generic competition. They knew that simply filing the lawsuits, without regard to the merits, would automatically provide a series of 30-month stays to delay FDA approval of Teva's and Impax's ANDAs and would otherwise burden and delay lawful generic competition from Impax, Teva and others. Moreover, they knew they needed to delay generic approval so they could reformulate TriCor, as TriCor 145mg tablets, obtain FDA approval, launch and force the market to convert to TriCor 145mg tablets before generic entry.

105.     Abbott and Fournier brought all of the Tablet Lawsuits with the intent to delay and thwart generic competition without regard to the merits of these actions. Many of Abbott's and Fournier's infringement claims in the Tablet Lawsuits were the subject of successful summary judgment motions brought by Teva and Impax. After Abbott and Fournier converted the market, they dismissed all claims and Tablet Lawsuits that had not already been dismissed or terminated. These dismissals further reflect Abbott's and

Fournier's true purpose in bringing and maintaining the Tablet Lawsuits, to delay generic competition. The filing and maintenance of the Tablet Lawsuits singly and collectively are wrongful and actionable both standing alone and as a component in their overall anti-generic scheme.

### D.    Abbott and Fournier Forced the Market to Convert a Second Time

#### 1.    The Reformulation: Abbott and Fournier Reformulated TriCor to Avoid Competition from an AB-Rated Drug and to Justify their Marketing Campaign

106.    During 2002, Abbott and Fournier met and planned to reformulate TriCor for a second time, this time by reducing the dosage from 160mg and 54mg to 145mg and 48mg tablets ("TriCor 145mg Tablets") and by seeking to change the dosing instructions on the basis that the reformulated tablets had "no food effect" ("NFE"), meaning they would perform similarly whether taken with or without a meal.

107.    In the fall of 2003, Abbott filed with the FDA the NDA for TriCor 145mg Tablets. To support this NDA, Abbott demonstrated the reformulated TriCor 145mg Tablets were bioequivalent to the TriCor 200mg Capsules. In other words, Abbott demonstrated that the TriCor 145mg Tablets performed with substantially the same efficacy as the TriCor 200mg Capsules, and it relied upon the same clinical efficacy and safety data that Fournier had submitted to the FDA in 1998 when it sought approval for the TriCor 200mg Capsules. This showing of bioequivalency meant that the TriCor 145mg Tablets were as safe and as effective as the TriCor 200mg Capsules, and vice versa.

108.    The reformulated TriCor 145mg Tablets contained just 15 milligrams less fenofibrate than the TriCor 160mg Tablets. Because the reformulated tablet was, like

33

TriCor 160mg Tablets, still bioequivalent to the original 200mg TriCor Capsules, the dosage change was clinically meaningless. Abbott and Fournier expected most physicians, health care plans, and third-party payors to view this distinction as insignificant. Reflecting that Abbott and Fournier anticipated that TriCor 145mg Tablets would be viewed the same as TriCor 160mg Tablets, they priced TriCor 145mg Tablets the same as TriCor 160mg Tablets. The real significance of the lower dose was that it prevented TriCor 145mg Tablets from being given an AB rating to TriCor 160mg Tablets.

109.    Abbott also claimed that TriCor 145mg Tablets had NFE, meaning the reformulated tablets would be absorbed at the same rate regardless of whether they were consumed with a meal. This modified dosing instruction provided Abbott with a way to differentiate TriCor 145mg Tablets from TriCor 160mg Tablets in their marketing materials. Abbott lacked any evidence that patients would benefit from this change.

### 2.    The Switch: Abbott Launched a Marketing Blitz

110.    In March 2004, both Teva and Impax received preliminary approval from the FDA for their ANDAs for a generic fenofibrate tablet. With FDA approval of generic entry delayed by patent-based litigation stays, Abbott and Fournier made plans for an aggressive launch of the TriCor 145mg Tablets.

111.    Abbott and Fournier knew that an effective and complete conversion of TriCor 160mg Tablets to TriCor 145mg Tablets would protect TriCor from any AB-rated generic. Whereas the first switch had been virtually completed in six months, Abbott and Fournier hoped to execute a switch to the 145mg Tablet in half that time. They estimated that if they accomplished the switch and conversion to TriCor 145mg Tablets before a

generic version of TriCor 160mg Tablets could enter the market, they would earn hundreds of millions of dollars more in revenues.

112.    On November 5, 2004, Abbott received FDA approval of the TriCor 145mg Tablets and, with Fournier, immediately launched an expensive marketing campaign, which sent an expanded Abbott and Fournier sales force canvassing physicians across the country to "educate" them on the reformulated TriCor and to persuade them to switch their prescriptions to the new formulation. Abbott and Fournier sales representatives also contacted pharmacists and managed health care organizations across the country to encourage them to stock TriCor 145mg Tablets and to include the reformulated products in their formularies of covered drugs. In this marketing blitz, Abbott's and Fournier's sales representatives touted the reformulated product, especially the NFE claim.

113.    However, Abbott and Fournier knew that many members of the health care community would view their reformulated product with skepticism. Their own marketing studies showed that whether TriCor could be taken without a meal was not viewed as a significant issue among most physicians.

### 3.    The Forced Conversion:  Abbott and Fournier Discontinued Sales and Production of TriCor 160mg Tablets

114.    To further ensure conversion of the market to TriCor 145mg Tablets, Abbott and Fournier stopped making and selling the TriCor 160mg Tablets. During the fall of 2004, in anticipation of FDA approval of the reformulated TriCor 145mg Tablets, they slowed production of TriCor 160mg Tablets and carefully bled-down inventories of

TriCor 160mg Tablets. In early November 2004, when they launched TriCor 145mg Tablets, they completely stopped production and sales of TriCor 160mg Tablets.

115.    Because of this inventory reduction, Abbott ran the risk of running out of TriCor stock if the new formulation was not approved by September 2004. Abbott's and Fournier's slow-down in production facilitated the depletion of TriCor 160mg Tablets on the market following the launch of TriCor 145mg Tablets, thereby helping to force the medical community to adopt the reformulated product. These efforts also helped to ensure that TriCor 160mg Tablets would not be commercially available within the distribution chain by the time a generic entered the fenofibrate market.

### 4.    The Purge:  Abbott Reclaimed TriCor 160mg Tablets

116.    Initially, Abbott and Fournier hoped to remove TriCor 160mg Tablets from the market by simply bleeding down the existing retail inventories within the distribution chain, i.e., the inventories of wholesalers and retail pharmacies. However, as they awaited FDA approval of TriCor 145mg Tablets, their concern about impending generic entry increased and they sought to accelerate that removal. Abbott and Fournier made plans and budgeted for other means of removing TriCor 160mg Tablets from the market.

117.    In March 2005, several months after introducing TriCor 145mg Tablets, Abbott wrote to retail chains and wholesalers requesting that they return any remaining TriCor 160mg Tablets in exchange for discounts and credits.

118.    In offering this incentive to wholesalers and retail pharmacies, Abbott deviated from its standard policy for returned goods. Abbott's policy was to provide an allowance on returned goods equal to 1% of total sales. Instead, to encourage the return

of TriCor 160mg Tablets, Abbott crafted a special tablet-exchange program and buy-back policy for TriCor 160mg Tablets.

119.    This additional tactic prompted the return of TriCor 160mg Tablets worth over $6.0 million dollars. Following Abbott's recovery of TriCor 160mg Tablets, the tablets were destroyed.

120.    Abbott's efforts to reclaim the remaining TriCor 160mg Tablets from the market prior to generic entry succeeded in ensuring that all or nearly all pharmacists did not have any TriCor 160mg Tablets on their shelves by the time the generic version of the product was able to enter the market. These efforts further helped to ensure that TriCor 160mg Tablets would not be commercially available within the distribution chain by the time a generic entered the fenofibrate market.

121.    Abbott's and Fournier's forced conversion strategy was successful, and by February of 2005 most prescriptions for TriCor were for TriCor 145mg Tablets. By May 2005, Abbott had depleted its inventory of TriCor 160mg Tablets and had killed TriCor 160mg Tablets.

### 5.    The Final Nail: Abbott and Fournier Interfered With the Normal and Customary Methods Generics Use to Compete

122.    As they had done following the first switch from TriCor 200mg Capsules to TriCor 160mg Tablets, Abbott and Fournier effectively removed the TriCor 160mg Tablets from First DataBank's NDDF, a pharmaceutical industry resource relied upon by many physicians, pharmacists and third-party payors, thus removing any meaningful reference to this product.

123.    In May of 2005, Abbott notified First DataBank that they had discontinued TriCor 160mg Tablets and thereby "obsoleted" TriCor 160mg Tablets. Thereafter, the reference was removed from the NDDF.

124.    Once the reference to TriCor 160mg Tablets was removed from the NDDF, the subsequently approved generic 160mg tablets were coded as a "single-source" product. As a result, many healthcare insurers treated the generic product as a brand name drug and did not give it preferred status on their formularies, causing higher co-pays for consumers.

125.    By designating the TriCor 160mg Tablets as "obsolete" in the NDDF, Abbott and Fournier prompted the removal of information from the market that would have informed physicians and pharmacists that Teva's generic drug was AB-rated to the TriCor 160mg Tablets, making it more difficult for a generic competitor to enter or compete in the fenofibrate market.

### E.    Abbott and Fournier Thwarted Generic Entry

126.    Following Abbott's direction to First DataBank to "obsolete" TriCor 160mg Tablets, the trial court in the Tablet Litigation entered a partial summary judgment in Teva's favor, which lifted the 30-month stay against FDA approval of the Teva ANDA, and the FDA granted final approval to Teva's generic version of the TriCor 160mg Tablets.

127.    Teva was then legally able to enter the fenofibrate market with a generic version of the TriCor 160mg Tablets. But Abbott's and Fournier's withdrawal of TriCor 160mg Tablets and conversion of the fenofibrate market was complete. Abbott and

Fournier had, again, foreclosed competition against TriCor and had denied consumers the choice of a generic fenofibrate tablet.

### Anticompetitive Effects

128.    Abbott's and Fournier's acts, practices, and scheme discussed herein were for the purpose of, and had the effect of, restraining competition unreasonably by preventing the entry of generic fenofibrate drugs.

129.    Absent Abbott's and Fournier's illegal anticompetitive conduct, at least one generic competitor would have begun marketing a generic version of fenofibrate.

130.    If a generic competitor had been able to enter the relevant market at either the time of the capsule or tablet switch and thereby compete with Abbott and Fournier, consumers and state entities (payors and reimburses) would have had the choice to substitute, and many would have substituted a lower-priced generic for the higher-priced brand-name drug.

131.    By preventing generic competitors from entering the market, Abbott and Fournier have deprived Plaintiff States and their consumers of the benefits of the competition that the federal and state antitrust laws, consumer protection laws and/or unfair competition statutes and related state laws are designed to promote, preserve, and protect.

### Injury

132.    As a direct and proximate result of the unlawful conduct alleged above, Plaintiff States and consumers were not and are not able to purchase, or pay reimbursements for purchases of, fenofibrate at prices determined by free and open

competition. Instead, they were forced to pay artificially high monopoly prices.
Consequently, they have been injured in their business and property in that, *inter alia*,
they have paid more and continue to pay more for fenofibrate than they would have paid
in a free and open competitive market. The Plaintiff States cannot quantify at this time
the precise amount of monetary harm which they have sustained, but allege that such
harm is substantial.

133.    As a direct and proximate result of the unlawful conduct alleged above,
the general economies of the Plaintiff States have sustained injury and the Plaintiff States
are threatened with continuing injury to their business and property unless Abbott and
Fournier are enjoined from their unlawful conduct.

134.    As a direct and proximate result of the unlawful conduct alleged above,
Abbott and Fournier have unjustly profited through inflated profit margins and will
continue to do so.

135.    Abbott's and Fournier's unlawful conduct is continuing and will continue
unless the injunctive and equitable relief requested by the Plaintiff States is granted.

136.    Plaintiff States do not have an adequate remedy at law.

## Count I: Monopolization under Sherman Act §2

137.    The preceding paragraphs are incorporated as if set forth herein.

138.    From 1998 to the present, Abbott has possessed monopoly power in the
relevant market of fenofibrate products in the United States.

139.    Abbott willfully and unlawfully maintained its monopoly power by
engaging in exclusionary conduct which had the intent, purpose and effect of illegally

preventing and blocking competition in the United States fenofibrate market in violation of Section 2 of the Sherman Act, 15 U.S.C. §2.

140.    Beginning in 1998, Abbott engaged in exclusionary conduct including, but not limited to: devising and implementing an anti-generic strategy, wrongfully asserting that Teva's and Impax's 200mg fenofibrate ANDAs infringed the '726 Patent, improperly procuring and enforcing the Stamm Patents, wrongfully listing the Stamm Patents in the Orange Book, systematically asserting unenforceable patents against Teva's and Impax's non-infringing 160mg fenofibrate ANDAs, stopping sales of 200mg Capsules and 160mg Tablets to force the market to accept the reformulated TriCor tablets that provided no new clinical benefit to patients, soliciting and accepting returns of TriCor 200mg Capsules and 160mg Tablets to accelerate the forced conversion scheme, and obsoleting any references, including the NDC number, from the NDDF for TriCor 200mg Capsules and TriCor 160mg Tablets.

141.    As a direct and proximate result of Abbott's exclusionary scheme, generic manufacturers have been unable to market and sell generic alternatives that pharmacists can substitute for TriCor prescriptions. Plaintiff States and consumers, therefore, have been injured in their business or property because they had to purchase TriCor without the reasonable availability of a lower-priced generic alternative.

### Count II: Conspiracy to Monopolize under Sherman Act §2

142.    The preceding paragraphs are incorporated as if set forth herein.

143.    Abbott and Fournier conspired to monopolize and did unlawfully monopolize the relevant market for fenofibrate products in the United States, thereby violating Section 2 of the Sherman Act, 15 U.S.C. §2.

41

144.    Abbott and Fournier have acted in concert to maintain willfully and unlawfully their monopoly power in the relevant market for fenofibrate drugs in the United States by engaging in unlawful exclusionary conduct which had the purpose and effect of unreasonably restraining competition.

145.    Abbott and Fournier engaged in their conspiracy with the specific intent to prevent generic competition in the United States fenofibrate market.

146.    Abbott and Fournier committed a series of acts in furtherance of their conspiracy, including, but not limited to: devising and implementing an anti-generic strategy that involved wrongfully asserting that Teva's and Impax's 200mg fenofibrate ANDAs infringed the '726 Patent, improperly procuring and enforcing the Stamm Patents, wrongfully listing the Stamm Patents in the Orange Book, systematically enforcing unenforceable patents against Teva's and Impax's, non-infringing 160mg fenofibrate ANDAs, stopping sales of 200mg Capsules and 160mg Tablets to force the market to accept reformulated TriCor products that provided no new clinical benefit to patients, soliciting and accepting returns of TriCor 200mg Capsules and 160mg Tablets to accelerate the forced conversion scheme, and obsoleting any reference, including the NDC number, from the NDDF for TriCor 200mg Capsules and TriCor 160mg Tablets.

147.    The conspiracy between Abbott and Fournier created a realistic threat to competition in the United States fenofibrate market.

148.    As a direct and proximate result of Abbott's and Fournier's exclusionary scheme, generic manufacturers have been unable to market and sell generic alternatives that pharmacists can substitute for TriCor prescriptions.  Plaintiff States and consumers,

therefore, have been injured in their business or property because they had to purchase TriCor without the reasonable availability of a lower-priced generic alternative.

## Count III: Illegal Restraint of Trade under Sherman Act §1

149.    The preceding paragraphs are incorporated as if set forth herein.

150.    From 1998 to the present, Abbott and Fournier entered into a contract, combination, or conspiracy to restrain trade in the U.S. market for fenofibrate drugs and thereby violated Section 1 of the Sherman Act, 15 U.S.C. §1.

151.    From 1998 to the present, Abbott and Fournier have possessed market power in the relevant market. Abbott and Fournier have willfully and unlawfully maintained their market power by excluding generic competitors from the relevant market.

152.    From 1998 to present, Abbott and Fournier unreasonably restrained trade through an exclusionary scheme that included, among other things: planning and committing a series of acts in furtherance of their conspiracy, devising and implementing an anti-generic strategy that involved wrongfully asserting that Teva's and Impax's 200mg fenofibrate ANDAs infringed the '726 Patent, improperly procuring and enforcing the Stamm Patents, wrongfully listing the Stamm Patents in the Orange Book, systematically asserting unenforceable patents against Teva's and Impax's non-infringing 160mg fenofibrate ANDAs, stopping sales of 200mg Capsules and 160mg Tablets to force the market to accept reformulated TriCor products that provided no new clinical benefit to patients, soliciting and accepting returns of TriCor 200mg Capsules and 160mg Tablets to accelerate the forced conversion scheme, and obsoleting any reference,

including the NDC number, from the NDDF for TriCor 200mg Capsules and TriCor 160mg Tablets.

153.    As a direct and proximate result of Abbott's and Fournier's exclusionary scheme, generic manufacturers have been unable to market and sell generic alternatives that pharmacists can substitute for TriCor prescriptions. Plaintiff States and consumers, therefore, have been injured in their business or property because they had to purchase TriCor without the reasonable availability of a lower-priced generic alternative.

154.    The anticompetitive effects of Abbott's and Fournier's conspiracy outweigh pro-competitive effects, if any, that their conduct may have had.

## Count IV:  State Law Claims

### Arizona

155.    Plaintiff State of Arizona repeats and realleges each and every allegation contained in paragraphs 1 through 154.

156.    Defendants' acts violates the Arizona Uniform State Antitrust Act, A.R.S. §§44-1401, *et seq.*, and Plaintiff State of Arizona, on behalf of itself, its states agencies and all persons who directly or indirectly purchased TriCor or fenofibrate-containing products, is entitled to relief thereunder.

### Arkansas

157.    Plaintiff State of Arkansas repeats and realleges each and every allegation contained in paragraphs 1 through 154.

158.    Defendants' acts violate, and Plaintiff State of Arkansas is entitled to relief on behalf of consumers and state government entities under the Arkansas Deceptive

Trade Practices Act, Ark. Code Arm. §4-88-101, *et seq.*, and the Arkansas Unfair

Practices Act, Ark. Code Ann. §4-75-301, *et seq.*

### California

159.    Plaintiff State of California realleges and incorporates all of the allegations

above from paragraphs 1 through 154.

160.    The aforementioned practices by Defendants were and are in violation of

the Cartwright Act, Cal. Bus. & Prof. code sections 16700, *et seq.*, and the California

Unfair Competition Act, Cal. Bus. & Prof. Code, sections 17200, *et seq.*  As a result of

Abbott's and Fournier's anticompetitive acts and unfair and deceptive practices and

violations of the California's Cartwright Act and Unfair Competition Act, all as more

fully described above, the State of California and its residents have suffered and been

injured in business and property and will continue to suffer ascertainable loss and

damages in an amount to be determined at trial.

161.    Accordingly, the State of California, including its state agencies, on behalf

of itself and its residents, seeks all relief available under California's Cartwright Act and

the Unfair Competition Act, including damages, restitution, disgorgement, unjust

enrichment, injunctions, treble damages, costs, reasonable attorneys' fees, and/or civil

penalties, and any such other equitable or monetary relief that might be available under

statute or equity.

### Connecticut

162.    Plaintiff State of Connecticut repeats and realleges each and every

allegation contained in paragraphs 1 through 154.

163.    Defendants' acts violate, and Plaintiff State of Connecticut is entitled to relief under, the Connecticut Antitrust Act, Conn. Gen. Stat. §35-24, *et seq.*, and the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §42-110a, *et seq.*

### District of Columbia

164.    The District of Columbia realleges and incorporates all of the allegations above from paragraphs 1 through 154.

165.    Defendants' acts violated provisions of the District of Columbia Antitrust Act, D.C. Code §28-4502 (2001) and D.C. Code §28-4503 (2001). These acts restrained competition in Defendants' sale of TriCor or fenofibrate-containing products in the District of Columbia.

166.    The District of Columbia (District), its political subdivisions and public agencies, along with residents of the District, have been injured by Defendants' actions, by reason of paying artificially inflated prices as direct or indirect purchasers of TriCor or fenofibrate-containing products.

167.    Plaintiff, the District, for its political subdivisions and public agencies, and as parens patriae on behalf of persons residing in the District, is entitled to monetary relief for injuries directly or indirectly suffered by the District, its political subdivisions and public agencies, and said persons, by reasons of the violations alleged above.

### Florida

168.    Plaintiff State of Florida realleges and incorporates all of the allegations above from paragraphs 1 through 154.

169.    The State of Florida, its departments, agencies and units of government purchased TriCor from Abbott through contracts that are assigned to the State of Florida. The State of Florida, Office of the Attorney General, asserts claims for damages and penalties under the Florida Antitrust Act on behalf of such entities, pursuant to § 542.27(2), Florida Statutes.

170.    As described above Defendants' acts violate § 542.18, Florida Statutes, and the State of Florida is entitled to relief, including damages, under § 542.22, Florida Statutes, for all direct purchases made pursuant to contracts that are assigned to the State of Florida.

171.    The State of Florida is entitled to a civil penalty of up to the maximum amount permitted by § 542.21, Florida Statutes, for each violation of § 542.18, Florida Statutes.

172.    The State of Florida is entitled to recover its costs and attorneys' fees pursuant to § 542.22(2), Florida Statutes.

173.    The State of Florida requests that the Court order such additional relief as it may deem just and proper.

174.    Certain Florida governmental entities and individuals residing in Florida purchased TriCor from Abbott. The State of Florida, Office of the Attorney General, asserts claims for damages under the Florida Deceptive and Unfair Trade Practices Act on behalf of such entities and individuals, pursuant to § 501.207(1)(c), Florida Statutes.

175.    As described above, Defendants' unfair methods of competition and unconscionable acts and practices in the conduct of trade and commerce offend established public policy and are immoral, unethical, oppressive, unscrupulous or

substantially injurious to governmental entities and individuals resident in the State of Florida. Thus, Defendants' unfair methods of competition and unconscionable acts and practices in the conduct of trade and commerce violate § 501.204, Florida Statutes.

176.    The sale of TriCor involves the conduct of "trade or commerce" within the meaning of § 501.203(8), Florida Statutes.

177.    The Attorney General of Florida has reviewed this matter and determined that an enforcement action serves the public interest.

178.    The State of Florida is entitled to relief, including damages, under § 501.207, Florida Statutes, for all direct and indirect purchases from Defendants.

179.    The State of Florida is entitled to a civil penalty of up to the maximum amount permitted by §§ 501.2075 or 501.2077, Florida Statutes, as applicable, for each violation of § 501.204, Florida Statutes.

180.    The State of Florida is entitled to recover its costs and attorneys' fees pursuant to § 501.2105, Florida Statutes.

181.    The State of Florida requests that the Court order such additional relief as it may deem just and proper.

## Idaho

182.    Plaintiff State of Idaho, ex rel. Lawrence G. Wasden, Attorney General of Idaho ("State of Idaho"), realleges and incorporates all of the allegations above from paragraphs 1 though 154.

183.    The State of Idaho represents itself, including its state agencies, and, as parens patriae, its persons, as defined by Idaho Code Section 48-103(2) of the Idaho Competition Act, residing in the State of Idaho who have purchased TriCor.

184.    Defendants' acts, as set forth above, had the purpose and effect of suppressing competition in the sale of TriCor in Idaho and elsewhere, as well as a substantial and adverse impact on prices for TriCor in the State of Idaho and constitute:

a.    an unreasonable restraint of Idaho commerce, as defined by Idaho Code Section 48-103(1) of the Idaho Competition Act, and

b.    an unlawful monopolization and conspiracy to monopolize any line of Idaho commerce.

185.    Defendants' acts have caused substantial injury and damage to the State of Idaho, its state agencies, and to persons in the State of Idaho.

186.    The State of Idaho, on behalf of itself, including its state agencies, and as parens patriae, its persons residing in the State of Idaho who have purchased TriCor, is entitled to relief under the Idaho Competition Act, Idaho Code § 48-101 *et seq.*

187.    The Defendants' activities are per se or intentional violations of the Idaho Competition Act, Idaho Code Sections 48-104 and 48-105. Pursuant to Idaho Code Section 48-108(2) of the Idaho Competition Act, the State of Idaho, possess authority, as parens patriae, to seek three times the total damages sustained, directly or indirectly, by persons residing in Idaho.

188.    Pursuant to Idaho Code Section 48-108(1)(c) of the Idaho Competition Act, the State of Idaho, including its state agencies, is authorized to recover its actual damages or restitution.

189.    Pursuant to Idaho Code Section 48-108(1)(d) of the Idaho Competition Act, the State of Idaho is authorized to seek from Defendants civil penalties of up to

$50,000 per violation of Idaho Code Sections 48-104 and 48-105 of the Idaho Competition Act.

190.    Pursuant to Idaho Code Section 48-108(1)(d) of the Idaho Competition Act, the State of Idaho is authorized to seek from Defendants attorney fees, reasonable expenses, and investigative costs.

## Iowa

191.    Iowa realleges and incorporates all of the allegations above from paragraphs 1 through 154.

192.    Defendants' acts as alleged in this complaint violate the Iowa Competition Act, Iowa Code sections 553, *et seq.*, the Iowa Consumer Fraud Act, Iowa Code section 714.16, and Iowa common law, and Plaintiff State of Iowa is entitled to all remedies available for such violations including damages for injuries sustained by state government agencies.

## Kansas

193.    Plaintiff State of Kansas repeats and realleges each and every allegation contained in paragraphs 1 through 154.

194.    Defendants' acts violate, and Plaintiff State of Kansas is entitled to relief under, the Kansas Restraint of Trade Act, Kan. Stat. Ann §50-101, *et seq.* Plaintiff State of Kansas is entitled to all remedies available for violations of these provisions including civil penalties up to the maximum amount permitted by K.S.A. 50-160, treble damages for injuries sustained by state government agencies and purchasers pursuant to K.S.A. 50-161(b), and reasonable attorneys' fees and costs pursuant to K.S.A. 50-161(c).

## Maine

195.    Plaintiff State of Maine realleges and incorporates all of the allegations above from paragraphs 1 through 154.

196.    Defendants' acts violate the Maine Monopolies and Profiteering Law, 10 MRSA §§1101 and 1102, and Plaintiff State of Maine is entitled under 10 MRSA §1104 to the following relief:

a.    Treble damages for injuries suffered directly or indirectly on behalf of itself, its state agencies and its citizens as parens patriae; (b) injunctive relief to restrain continuing violations of law; (c) civil penalties in the amount of $100,000 for each course of conduct alleged herein that constitutes a violation of 10 M.R.S.A §§1101 or 1102; and (d) necessary and reasonable costs, expert fees and attorney fees.

## Maryland

197.    Plaintiff State of Maryland realleges and incorporates all of the allegations above from paragraphs 1 through 154.

198.    The aforementioned practices by Defendants were, and are in violation of the Maryland Antitrust Act, Md. Com. Law Code Ann. §§11-201 through 213.

199.    During the relevant period, TriCor and other fenofibrate products were in the regular, continuous and substantial flow of intrastate commerce in Maryland. TriCor was shipped to pharmacies located in Maryland which sold TriCor to persons in Maryland. TriCor purchases were also paid for by the Maryland Pharmacy Program (which serves Maryland Medicaid clients) and by Maryland's prescription benefits program (which serves Maryland employees and retirees).

200.    During the relevant period, the Maryland Pharmacy Program paid in excess of $3.2 million for TriCor. Maryland's State Employee and Retiree Health and Welfare Benefits Program paid in excess of $8.6 million for TriCor. As a result of the defendants' unlawful conduct, consumers, the Maryland Pharmacy Program and the State Employee and Retiree Health and Welfare Benefits Program paid more for TriCor than they would have paid in a competitive market.

201.    Plaintiff State of Maryland brings this action against Defendants in the following capacities:

      a.    Pursuant to Md. Com. Law Code Ann. §11-209(a) in its sovereign capacity for injunctive relief, civil penalties and all other available equitable remedies; (b) pursuant to Md. Com. Law Code Ann. §11-209(b) to recover three times the amount of damages sustained by the Maryland Pharmacy Program and Maryland's prescription benefits program. These Maryland State entities are entitled to money damages regardless of whether they purchased TriCor directly or indirectly from Defendants. Md. Com. Law Code Ann. §11-209(b)(2); (c) pursuant to Md. Com. Law Code Ann. §11-209(b)(5) as parens patriae on behalf of persons residing in Maryland. These persons are entitled to three times the amount of money damages sustained regardless of whether they purchased TriCor directly or indirectly from Defendants. Md. Health-Gen. Code Ann. §21-1114.

202.    Plaintiff State of Maryland also seeks, pursuant to Md. Com. Law Code §11-209(b) reimbursement of reasonable attorneys fees, expert fees and costs.

## Massachusetts

203.    The Commonwealth of Massachusetts incorporates paragraphs 1 through 154 as if fully restated here.

204.    By virtue of the foregoing, defendants have engaged in unfair methods of competition and unfair or deceptive acts or practices in violation of the Massachusetts Consumer Protection Act, G.L. c. 93A, § 2.

205.    Defendants knew or should have known that their conduct violated the Commonwealth of Massachusetts' Consumer Protection Act, MGL. c. 93A, § 2.

## Michigan

206.    Plaintiff State of Michigan repeats and realleges each and every allegation contained in paragraphs 1 through 154.

207.    The Michigan Attorney General proceeds on behalf of the Plaintiff State of Michigan, its state agencies and as parens patriea on behalf of all consumers under Mich. Comp. Laws Ann. § 14.28 and § 14.101, Mich Comp. Laws Ann. § 455.778, and the common law of Michigan.

208.    The aforementioned practices by Defendants were and are in violation of the Michigan Consumer Protection Act, Mich Comp. Laws Ann. § 445.901 *et seq.*, and the Michigan Antitrust Reform Act, Mich. Comp. Laws Ann. § 445.771, *et seq.*

209.    As a result of Defendants' unfair, unconscionable, or deceptive methods, acts or practices in the conduct of trade in violation of the Michigan Consumer Protection Act and Defendants' conspiracy to monopolize and actual monopolization of the fenofibrate market for the purpose of excluding competition in violation of the Michigan Antitrust Reform Act, all as more fully described above, the Plaintiff State of Michigan

53

and its consumers have suffered and been injured in business and property by reason of paying artificially inflated prices as direct or indirect purchasers of TriCor and will continue to suffer ascertainable loss and damages in an amount to be determined at trial.

210.    Accordingly, Plaintiff State of Michigan, on behalf of itself, its agencies, and as parens patriae on behalf of its consumers that directly or indirectly purchased TriCor, is entitled to injunctive relief, civil penalties, damages, costs and attorney's fees under the Michigan Consumer Protection Act, Mich Comp Law Ann. § 445.901 *et seq.*, the Michigan Antitrust Reform Act, Mich. Comp. Laws Ann. § 445.771, *et seq.*, and the common law of Michigan, and requests that the Court order such additional relief as it may deem just and proper.

### Minnesota

211.    Plaintiff State of Minnesota repeats and realleges each and every allegation contained in paragraphs 1 through 154.

212.    Defendants' acts violate, and Plaintiff State of Minnesota on behalf of itself, its state agencies, and as parens patriae on behalf of its consumers is entitled to relief under the Minnesota Antitrust Law of 1971, Minn. Stat. §§ 325D.49-.66, the Uniform Deceptive Trade Practices Act of 1973, Minn. Stat. §§ 325D.43-.48, Minn. Stat. Chapter 8, and Minnesota common law for unjust enrichment.

213.    Plaintiff State of Minnesota is entitled to treble damages under Minn. Stat. § 325D.57. Plaintiff State of Minnesota is entitled to costs and reasonable attorneys' fees under Minn. Stat. § 325D.45 and .57. Plaintiff State of Minnesota is entitled to injunctive relief under Minn. Stat. §§ 325D.45 and .58.

214.    Defendants shall be subject to civil penalties under Minn. Stat. § 325D.56.

### Missouri

215.    Plaintiff State of Missouri repeats and realleges each and every allegation contained in paragraphs 1 through 154 with the same force and effect as if here set forth in full.

216.    The aforementioned acts and practices of the Defendants were in violation of the Missouri Antitrust Law, specifically, §416.031 Revised Statutes of Missouri (RSMo) 2000.  The State of Missouri brings this action both on behalf of itself and its public agencies, including by right of assignment, and as parens patriae as to natural persons, to enforce public rights and to protect citizen consumers against the violation of such laws and, specifically, seeks injunctive relief, damages and all other relief available pursuant to §416.071 and §416.121, RSMo (2000).

217.    The aforementioned acts and practices of the Defendants were also in violation of the Missouri Merchandising Practices Act, §407.020, RSMo 2000, and the Missouri Code of State Regulations, specifically 15 CSR 60-7.010 *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, which prohibit the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce, including such acts, uses and employments, committed before, during or after the sale. The Attorney General brings this action in its sovereign capacity to enforce such law and to obtain the relief available pursuant to §§ 407.100, 407.130 and 407.140, RSMo (2000), including injunctions, restitution, the assessment of civil penalties and recovery of all costs of its investigation and litigation as provided therein.

## Nevada

218.    Plaintiff State of Nevada repeats and realleges each and every allegation contained in paragraphs 1 through 154.

219.    The State of Nevada represents itself, its state agencies, and its natural persons who have purchased TriCor. Defendants' acts violate the Nevada Unfair Trade Practice Act, Nev. Rev. Stat. § 598A, *et seq.*, including Nev. Rev. Stat. § 598A.060. Plaintiff is entitled to recover actual damages, treble damages, and reasonable attorneys' fees and costs under Nev. Rev. Stat. § 598A.160 and Nev. Rev. Stat. § 598A.200, injunctive relief under Nev. Rev. Stat. § 598A.070, and civil penalties in an amount not to exceed 5 percent of the gross income realized by the sale of TriCor by the Defendants in the State of Nevada in each year in which the prohibited activities occurred pursuant to Nev. Rev. Stat. § 598A.170.

## New York

220.    Plaintiff State of New York repeats and realleges each and every allegation contained in paragraphs 1 through 154.

221.    The State of New York brings this action in its sovereign capacity to protect its citizens and recover civil penalties.

222.    The State of New York brings this action on behalf of itself and its public state and local entities that purchased TriCor directly and/ or indirectly.

223.    The State of New York brings this action as parens patriae as to natural persons who purchased TriCor directly and/or indirectly.

224.    Defendants' acts unreasonably restrained trade and commerce causing injury and damage to public state and local entities and natural persons in the State in

56

violation of New York General Business Law §§340 - 347, and Plaintiff New York is entitled to damages, injunctive relief, penalties and other appropriate relief thereunder.

225.    Defendants engaged in repeated and persistent fraudulent and illegal acts in the conduct of their business to thwart competition from generic fenofibrate in violation of New York Executive Law §63(12), and Plaintiff New York is entitled to damages, injunctive relief, penalties and other appropriate relief thereunder.

226.    By unlawfully thwarting competition from generic fenofibrate, Defendants wrongfully deprived purchasers of the lower, competitive price that generic fenofibrate would have sold for in a free and open competitive market. Defendants thereby wrongfully appropriated for themselves monetary benefits that they would not have had in a competitive market, and have been unjustly enriched. Plaintiff New York is entitled to restitution, disgorgement and other appropriate relief as a result of Defendants' unlawful conduct.

### North Carolina

227.    Plaintiff State of North Carolina repeats and realleges each and every allegation contained in paragraphs 1 through 154.

228.    Defendants' acts violate North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1 *et seq.* Plaintiff State of North Carolina, on behalf of itself, its state agencies and all persons who directly or indirectly purchased TriCor or fenofibrate-containing products, is entitled to relief under N.C. Gen. Stat. §§ 75-1, 75-1.1, 75-2 and 75-2.1 and the common law of North Carolina.

229.    Plaintiff State of North Carolina is entitled to a civil penalty under N.C. Gen. Stat. §§ 75-8 and 75-15.2 of up to $5,000.00 for each violation, or each week of

defendants' continuing violation, as defendants' acts were knowingly violative of North Carolina law.

230.    Plaintiff State of North Carolina is entitled to recover its costs and attorneys' fees pursuant to N.C. Gen. Stat. § 75-16.1 because defendants have willfully engaged in acts that violate North Carolina law and there has been an unwarranted refusal by defendants to fully resolve the matter which constitutes the basis of such suit.

## Ohio

231.    Plaintiff State of Ohio realleges and incorporates all of the allegations from paragraph 1 through 154.

232.    The aforementioned practices by Abbott and Fournier were in violation of Ohio's Antitrust law, the Ohio Valentine Act, Ohio Rev. Code §§1331.01 *et seq.* and the common law of Ohio.

233.    Pursuant to Ohio Rev Code §§1331.01 *et seq.*, §109.81, §109.82 and the common law of Ohio, Plaintiff State of Ohio is entitled injunctive relief, civil penalties and the recovery of attorney's fees and costs.

## Oregon

234.    Plaintiff State of Oregon, ex rel. Hardy Myers, Attorney General of Oregon ("State of Oregon" or "Oregon"), realleges and incorporates all of the allegations above from paragraphs 1 through 154.

235.    The State of Oregon represents itself, including its state agencies, and as parens patriae, its political subdivisions and natural persons in the State who have purchased TriCor.

58

236.    Defendants' acts of conspiracy and unreasonable restraint of trade and commerce had the purpose and effect of suppressing competition in the sale of TriCor in Oregon and elsewhere, and had a substantial and adverse impact on prices for TriCor in Oregon.

237.    Defendants' acts have caused substantial injury and damage to the State of Oregon, its state agencies and political subdivisions, and to natural persons in the State.

238.    The State of Oregon, on behalf of itself, including its state agencies, and as parens patriae, its political subdivisions and natural persons in the State who purchased TriCor, is entitled to relief under the Oregon Antitrust Law, Oregon Revised Statutes § ("ORS") 646.705, et seq.

239.    The Defendants' activities are per se violations of Oregon's Antitrust Law, ORS 646.725 and ORS 646.730.  Pursuant to ORS 646.760, 646.770, ORS 646.775, and ORS 646.780, the Attorney General of Oregon possesses authority to seek equitable and monetary relief for antitrust injuries sustained by the State, including its state agencies, and by its political subdivisions and natural persons in the State.

240.  ˙ Pursuant to ORS 646.775 and ORS 646.780, the State of Oregon is entitled to recover three times the total damages sustained by the State, including its state agencies, and by its political subdivisions and natural persons in the State, by reason of Defendants' violations of the Oregon Antitrust Law.

241.    Pursuant to ORS 646.760, Defendants are each liable to the State of Oregon for civil penalties of $250,000 for each of their violations of the Oregon Antitrust Law.

242.    Pursuant to ORS 646.760, 646.770, ORS 646.775, and ORS 646.780, the State of Oregon is entitled to its costs incurred in bringing this action, plus reasonable attorney fees, expert witness fees and costs of investigation.

## Pennsylvania

243.    *The Commonwealth of Pennsylvania realleges and incorporates all of the allegations above from paragraphs 1 through 154.*

244.    The acts and practices of Defendants, as set forth herein, constitute unfair methods of competition and unfair or deceptive acts or practices in the conduct of *Defendants' business in violation of the Unfair Trade Practices and Consumer Protection Law* ("UTPCPL").

245.    In distributing, marketing and selling TriCor to the Commonwealth and Pennsylvania Consumers, and in otherwise engaging in the conduct more fully described herein with respect to TriCor, Abbott and Fournier, individually and jointly, are engaging in trade or commerce that directly or indirectly harmed consumers in this Commonwealth within the meaning of 73 P.S. §201-2(3).

246.    Abbott and Fournier violated the UTPCPL:

a.    each time Abbott and/or Fournier prosecuted and obtained multiple patents through inequitable conduct; (b) each time Abbott and/or Fournier listed inequitably obtained patents in the Orange Book as maintained by the Food and Drug Administration; (c) each time Abbott and/or Fournier filed sham patent litigation for the purpose of foreclosing and delaying competition in the market for fenofibrate; (d) each time Abbott and/or Fournier reformulated TriCor to prevent generic entry; (e) each time Abbott and/or Fournier contacted a

prescribing physician to convert the market over to a new formulation of TriCor;

(f) each time Abbott and/or Fournier contacted pharmacies to remove prior

formulations of TriCor to make it commercially unavailable to prevent generic

entry; (g) each time Abbott and/or Fournier interfered with the normal and

customary channels of distribution used by generics; (h) each time a medical

provider prescribed TriCor; (i) each time a request for reimbursement was made

to a Commonwealth of Pennsylvania program for TriCor; (j) each time a patient

and/or his or her insurer was charged for TriCor; and (k) each time Abbott and/or

Fournier engaged in conduct actionable under the other counts of this Complaint

brought by the Commonwealth of Pennsylvania and/or engaged in conduct in

violation of the statute and laws of the Commonwealth of Pennsylvania.

247.    Abbott's and Fournier's TriCor products reimbursed or purchased by the

Commonwealth of Pennsylvania or purchased by Pennsylvania Consumers were used for

personal, family or household use.

248.    Abbott's and Fournier's conduct, as more fully described herein,

constitutes unfair methods of competition and unfair or deceptive acts or practices within

the meaning of 73 P.S. §201-2(4), including, but not limited to, the following:

a.    causing likelihood of confusion or misunderstanding as to the

source, sponsorship, approval or certification of goods or services, within the

meaning of 73 P.S. §201-2(4) (ii); (b) representing that goods or services have

sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that

they do not have or that a person has a sponsorship, approval, status, affiliation or

connection that he does not have; within the meaning of 73 P.S. §201-2(4) (v); (c)

engaging in any other fraudulent or deceptive conduct which creates the likelihood of confusion or of misunderstanding; within the meaning of 73 P.S. §201-2(4) (xxi).

249.    The Commonwealth of Pennsylvania is empowered to bring this action on behalf of "persons" who have purchased TriCor at artificially-inflated prices and as a result, have suffered, are suffering and will continue to suffer irreparable harm as a result of Abbott's and Fournier's actions. "Persons" include, but are not limited to, natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations and any other legal entities within the meaning of 73 P.S. §201-2(2).

250.    The Commonwealth of Pennsylvania also has standing to bring this claim in that the Commonwealth of Pennsylvania is both an end payor and purchaser/reimburser of TriCor through its Medicaid, PACE and state hospitals programs. The Commonwealth of Pennsylvania performs these functions, not for its own business purposes, but rather in its representative capacity on behalf and for the benefit of its constituents who, in turn, make use of TriCor primarily for personal, family and/or household purposes.

251.    Defendants agreed to and did, in fact, act in restraint of trade or commerce in a market that includes Pennsylvania, by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which fenofibrate was sold, distributed or obtained in Pennsylvania.

252.    Defendants deliberately failed to disclose material facts to the Commonwealth of Pennsylvania and Pennsylvania Consumers concerning Defendants' unlawful activities and artificially-inflated prices for fenofibrate. Defendants owed a

duty to disclose such facts and considering the relative lack of sophistication of the average, non-business consumer, Defendants breached that duty by their silence. Defendants misrepresented to all consumers during the relevant period that Defendants' fenofibrate prices were competitive and fair.

253.    Defendants' unlawful conduct had the following effects: (1) fenofibrate price competition was restrained, suppressed and eliminated throughout Pennsylvania; (2) fenofibrate prices were raised, fixed, maintained and stabilized at artificially-high levels throughout Pennsylvania; (3) Commonwealth of Pennsylvania and Pennsylvania Consumers were deprived of free and open competition; and (4) Commonwealth of Pennsylvania and Pennsylvania Consumers paid supracompetitive, artificially inflated prices for fenofibrate.

254.    As a direct and proximate result of the Defendants' violations of law, Commonwealth of Pennsylvania and Pennsylvania Consumers have and will continue to suffer an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss has been caused by Defendants' willful and deceptive conduct, as described herein.

255.    Defendants' deception, including its affirmative misrepresentation and omissions concerning the inequitable patent prosecution, improper FDA Orange Book listing and the price of fenofibrate, likely misled all consumers acting reasonably under the circumstances to believe that they were purchasing fenofibrate at prices borne by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Commonwealth of Pennsylvania and Pennsylvania

Consumers as they related to the choice, efficacy and/or cost of fenofibrate they purchased. Defendants violated the UTPCPL under its "catch-all provision," 73 P.S. §201-2(4) (xxi), by engaging in deceptive conduct which created a likelihood of confusion or misunderstanding as alleged therein and Commonwealth of Pennsylvania seeks all relief available hereunder.

256.    Abbott's and Fournier's conduct, individually and jointly, more fully described herein is, accordingly, proscribed and unlawful pursuant to 73 P. S. §201-3.

257.    Abbott's and Fournier's conduct, individually and jointly, as more fully described herein, was willful within the meaning of 73 P.S. §201-8.

258.    The Attorney General has determined that these proceedings to enjoin Abbott's and Fournier's conduct are in the public interest.

259.    The Commonwealth of Pennsylvania therefore seeks the entry of a permanent injunction restraining Abbott's and Fournier's unlawful conduct and mandating corrective measures pursuant to 73 P.S. §201-4.

260.    The Commonwealth of Pennsylvania also requests that the Court require Abbott and Fournier to restore to the Commonwealth of Pennsylvania and Pennsylvania Consumers monies acquired from the sale of its prescription drugs, TriCor, during the period of time Defendant's unlawful conduct took place, pursuant to 73 P.S. §201-4.1.

261.    In addition, and in light of Abbott's and Fournier's willful and improper conduct as herein described, the Commonwealth of Pennsylvania requests that the Court award a civil penalty to the Commonwealth of Pennsylvania not exceeding:

      a.     as to affected Pennsylvania Consumers under the age of sixty (60) years, $1,000.00 per violation; (b) and as to affected Pennsylvania Consumers sixty (60) years of age or older, $3,000.00 per violation.

262.    Abbott is liable for its actions and the actions of its co-conspirators for each of these violations as independent unfair and deceptive acts in violation of the UTPCPL, and for its course of conduct comprising an unfair and deceptive practice in violation of the UTPCPL.

263.    Fournier is liable for its actions and the actions of its co-conspirators for each of these violations as independent unfair and deceptive acts in violation of the UTPCPL, and for its course of conduct comprising an unfair and deceptive practice in violation of the UTPCPL.

264.    As a result of Abbott's and Fournier's unfair and deceptive trade practices, the Commonwealth of Pennsylvania and Pennsylvania Consumers have suffered and will continue to suffer ascertainable loss and damages in an amount to be determined at trial.

265.    Accordingly, the Commonwealth of Pennsylvania, on behalf of itself and Pennsylvania Consumers, seeks all relief available, including treble damages, restitution, disgorgement, and/or civil penalties, under the UTPCPL.

266.    Defendants' combinations or conspiracies had the following effects: (1) fenofibrate price competition was restrained, suppressed and eliminated throughout Pennsylvania; (2) fenofibrate prices were raised, fixed, maintained and stabilized at artificially-high levels throughout Pennsylvania; (3) Commonwealth of Pennsylvania and Pennsylvania Consumers were deprived of free and open competition; and (4)

Commonwealth of Pennsylvania and Pennsylvania Consumers paid supracompetitive, artificially-inflated prices for fenofibrate.

267.    During the relevant period, Defendants' illegal conduct had a substantial effect on Pennsylvania residents.

268.    As a direct and proximate result of Defendants' unlawful conduct, the Commonwealth of Pennsylvania and Pennsylvania Consumers have been injured in their business and property and are threatened with further injury.

269.    By reason of the foregoing, defendants have entered into agreements in restraint of trade and have monopolized in violation of Pennsylvania common law. Accordingly, the Commonwealth of Pennsylvania, on behalf of itself and Pennsylvania Consumers, seeks all relief available, including damages, restitution and/or disgorgement, under Pennsylvania common law proceeding pursuant to 73 P.S. §732-204 (c).

270.    As set forth above, Abbott and Fournier, individually and jointly, have been unjustly enriched as a result of engaging in the following practices with respect to the Commonwealth of Pennsylvania and Pennsylvania Consumers.

    a.    obtaining multiple patents through inequitable conduct and improperly listing these patents with the Food and Drug Administration; (b) knowing they were obtained improperly and then filing sham patent litigation for the purpose of foreclosing and delaying competition in the market for fenofibrate; (c) forcing the market to convert to a new formulation before generic entry by reformulating TriCor with only minor changes to the form and dosage strength that did not provide any significant new clinical benefit for the purpose of eliminating the generic bioequivalent AB-rating for the prior formulation; (d)

creating an artificial product differentiation as a marketing tool to convince

physicians to stop writing prescriptions for the old formulation and to write

prescriptions only for the new formulation; (e) stopping promotion and sales of

the previous TriCor formulation upon the introduction of the new formulation; (f)

removing the old TriCor formulation from the market, so as to make it

commercially unavailable by the time a generic competitor could enter the

market; and (g) interfering with the normal and customary channels of

distribution used by generics.

271.    The Commonwealth of Pennsylvania and Pennsylvania Consumers were

purchasers, reimbursers, and/or end payors of Abbott's and Fournier's drug, TriCor, and

have paid amounts far in excess of the competitive price for TriCor and generic

fenofibrate that would have prevailed in a competitive and fair market.

272.    Abbott and Fournier, individually and jointly, knew of and has appreciated

and retained, or used, the benefits of the Commonwealth of Pennsylvania and

Pennsylvania Consumers' purchases of its drug, TriCor, at amounts far in excess of the

competitive price.  Defendants manipulated the patent process and the FDA Orange Book

listing process and filed sham litigation to enforce the improperly obtained and listed

patents to eliminate consumer choice of generic fenofibrate.  Each of these acts was

intended to increase the market share of TriCor thereby increasing its sales and profits.

273.    For those customers that purchase directly or indirectly from Abbott at

artificially-inflated and supra-competitive prices, Abbott's and Fournier's increases to

prices that would have prevailed in a competitive and fair market directly benefit Abbott

in the form of increased revenues.

274. Based upon Abbott's and Fournier's conduct set forth in this complaint, it would be inequitable and unjust for Abbott and Fournier, individually and jointly, to retain such benefits without payment of value.

275. Abbott and Fournier, individually and jointly, will be unjustly enriched if it is permitted to retain the direct or indirect benefits received or used resulting from the purchase of TriCor by the Commonwealth of Pennsylvania and Pennsylvania Consumers. The Commonwealth of Pennsylvania, on behalf of itself and Pennsylvania Consumers, seeks to recover the amounts that unjustly enriched Abbott and Fournier, individually and jointly.

276. The Commonwealth of Pennsylvania and Pennsylvania Consumers are therefore entitled to equitable relief in the form of an injunction, restitution and disgorgement, legal relief in the form of damages and any other relief the Court deems appropriate.

## South Carolina

277. Plaintiff State of South Carolina realleges and incorporates all of the allegations above from paragraphs 1 through 154.

278. South Carolina represents the South Carolina Medicaid Program ("South Carolina Medicaid"), the South Carolina Employee Insurance Program ("South Carolina EIP"), and South Carolina consumers in this action.

279. Abbott and Fournier's conduct constitutes "unfair methods of competition and unfair or deceptive acts or practices" under §39-5-20 of the South Carolina Code of Laws.

280.    South Carolina Medicaid and South Carolina EIP are represented in an individual capacity pursuant to §39-5-140(a). Abbott and Fournier's conduct constitutes a "willful or knowing violation of §39-5-20" under §39-5-140(d), and thus South Carolina seeks to recover treble damages under §39-5-140(a) on behalf of South Carolina Medicaid and South Carolina EIP for all purchases of TriCor made by South Carolina Medicaid and South Carolina EIP during the relevant time period.

281.    South Carolina consumers are represented in a statutory parens patriae capacity under §39-5-50 and a common law parens patriae capacity. South Carolina consumers are defined as any natural person, corporate entity, or government entity that purchased TriCor in South Carolina. Pursuant to §39-5-50(b), South Carolina seeks that this Court restore unto South Carolina consumers any ascertainable loss incurred in making any payments for purchases of TriCor. Pursuant to §39-5-50(a), South Carolina seeks injunctive relief to prohibit Abbott from engaging in the conduct described in this complaint.

282.    Abbott and Fournier's conduct constitutes a "willful or knowing violation of §39-5-20" under §39-5-110(c). South Carolina seeks an award of civil penalties under §39-5-110(a) in the amount of $5,000.00 per sale of TriCor made in South Carolina.

283.    South Carolina seeks attorneys' fees and costs under §39-5-50(a) and §39-5-140(a).

284.    South Carolina requests any other relief that this Court deems appropriate.

## Texas

285.    Plaintiff State of Texas repeats and realleges each and every allegation set forth in paragraphs 1 through 154.

286.    This action is brought in the name of the State of Texas by the Attorney General of Texas, acting within the scope of his official duties under the authority granted to him by the Constitution and the laws of the State of Texas, and specifically under the authority granted by the Texas Free Enterprise and Antitrust Act of 1983, Texas Business and Commerce Code section 15.01 *et seq.*

287.    Defendants' actions violate, and the State of Texas is entitled to relief, under the Texas Free Enterprise and Antitrust Act of 1983, Texas Business and Commerce Code section 15.01 *et seq.*

288.    The State of Texas requests that it be awarded damages from injury to the state Medicaid Program pursuant to Texas Business and Commerce Code section 15.21(a).

289.    The State of Texas further requests that it be awarded civil penalties pursuant to Texas Business and Commerce Code section 15.20.

290.    The State of Texas further requests that it be awarded  injunctive relief to prevent defendants in the future from engaging in conduct similar to the improper conduct alleged in this complaint pursuant to Texas Business and Commerce Code section 15.20.

291.    The State of Texas its costs of this action, including reasonable attorneys' fees, costs, and where applicable, expert fees as provided in Business and Commerce Code section 15.20(b) and Texas Government Code section 402.006(c).

## **Vermont**

292.    Plaintiff State of Vermont repeats and realleges each and every allegation contained in paragraphs 1 through 154.

293.    Defendants' acts violate, and Plaintiff State of Vermont is entitled to relief under, the Vermont Consumer Fraud Act, 9 V.S.A. Sections 2451-2466.

## Washington

294.    Plaintiff State of Washington realleges and incorporates all of the allegations from paragraphs 1 through 154.

295.    Defendants' acts violate Wash. Rev. Code 19.86, including Wash, Rev. Code 19.86.020, Wash. Rev. Code 19.86.030, and/or Wash. Rev. Code 19.86.040.

296.    Plaintiff State of Washington on behalf of itself, its state agencies and as parens patriae for all natural persons who purchased defendants' fenofibrate-based drugs is entitled to recover damages and attorneys' fees under RCW 19.86.090, injunctive relief and restitution under RCW 19.86.080 and civil penalties under RCW 19.86.140.

## West Virginia

297.    Plaintiff State of West Virginia repeats and realleges each and every allegation contained in paragraphs 1 through 154 with the same force and effect as if here set forth in full.

298.    The aforementioned practices by Defendants were in violation of the West Virginia Antitrust Act, W. Va. Codes 47-18-1 *et seq.*, and the West Virginia Consumer Credit and Protection Act, W. Va. Code s 46A-1-101 *et seq.*, and the State of West Virginia, its state agencies, and political subdivisions, and the natural persons it represents are entitled to relief there under.

### Prayer for Relief

Accordingly, the Plaintiff States request that this Court:

1.      Adjudge and decree that Abbott and Fournier violated sections 1 and 2 of the Sherman Act, 15 U.S.C. §§1, 2;

2.      Adjudge and decree that the foregoing activities violated each of the state statutes enumerated in this Complaint;

3.      Enjoin and restrain, pursuant to federal and state law, Abbott and Fournier, their affiliates, assignees, subsidiaries, successors, and transferees, and their officers, directors, partners, agents and employees, and all other persons acting or claiming to act on their behalf or in concert with them, from continuing to engage in any anticompetitive conduct and from adopting in the future any practice, plan, program, or device having a similar purpose or effect to the anticompetitive actions set forth above;

4.      Award to Plaintiff States any other equitable relief as the Court finds appropriate to redress Defendants' violations of federal or state antitrust law or restore competition;

5.      Award to each Plaintiff State the maximum civil penalties allowed by law;

6.      Award to each Plaintiff State treble damages for overcharges paid by State entities or the State's purchasers of TriCor;

7.      Award to each Plaintiff State any other statutory damages, restitution or equitable disgorgement for the benefit of the state and its consumers as appropriate under each state's law;

8.      Award to each Plaintiff State its costs, including reasonable attorneys'

fees; and as may be appropriate under state law, expert witness fees and investigation

costs;

9.      Order any other relief that this Court deems proper.

## **Jury Trial Demanded**

The Plaintiff States demand a trial by jury of all issues so triable in this cause.

Dated: April 18 , 2008                        Respectfully submitted,

THE PLAINTIFF STATES


BILL McCOLLUM
Attorney General
STATE OF FLORIDA
Patricia A. Conners
Associate Deputy Attorney General
R. Scott Palmer
Special Counsel-Assist. Attorney General
Elizabeth G. Arthur
Assistant Attorney General
PL-01, The Capitol
Tallahassee, Florida 32399-1050
Telephone: 850-414-3300
Facsimile: 850-488-9134
Elizabeth.Arthur@myfloridalegal.com

STATE OF ARIZONA
by Attorney General TERRY GODDARD
Nancy M. Bonnell
Antitrust Unit Chief
Public Advocacy Division
Office of the Attorney General
1275 West Washington
Phoenix, Arizona 85007-2926
Telephone: 602-542-7752

STATE OF ARKANSAS
by Attorney General DUSTIN McDANIEL;
Bart Dickinson
Assistant Attorney General
Office of the Attorney General
323 Center Street
Little Rock, Arkansas 72201
Telephone: 501-682-3561

STATE OF CALIFORNIA
by Attorney General EDMUND G. BROWN, JR.
Cheryl L. Johnson
Deputy Attorney General
300 S. Spring Street, Room 1702
Los Angeles, California 90013
Telephone:  213-897-2688

STATE OF CONNECTICUT
by Attorney General RICHARD BLUMENTHAL
Michael E. Cole
Chief, Antitrust Department
Arnold B. Feigin
Assistant Attorney General
55 Elm Street
Hartford, Connecticut 06106
Telephone: 860-808-5040

DISTRICT OF COLUMBIA
by Interim Attorney General PETER J. NICKLES
Bennett Rushkoff
Senior Division Counsel
Public Advocacy Division
Don Allen Resnikoff
Senior Assistant Attorney General
Craig Farringer
Assistant Attorney General
Susan Phan
Assistant Attorney General
Consumer and Trade Protection Section
441 Fourth Street, NW, Suite 1130N
Washington, District of Columbia 20001
Telephone: 202-727-3225

STATE OF IDAHO
by Attorney General Lawrence G. Wasden

Brett T. DeLange
Deputy Attorney General
Consumer Protection Division
Office of the Attorney General
Attorneys for the State of Idaho
650 W. State St. Lower Level
P.O. Box 83720
Boise, Idaho 83720-0010
Telephone: 208-334-2424

STATE OF IOWA
by Attorney General THOMAS J. MILLER
John F. Dwyer
Attorney
Layne M. Lindebak
Assistant Attorney General
2nd Floor, Hoover Office Building
East 13th & Walnut Street
Des Moines, Iowa 50319
Telephone: 515-281-7054

STATE OF KANSAS
by Attorney General STEPHEN N. SIX
Lynette R. Baker
Assistant Attorney General
Consumer Protection/Antitrust
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66212
Telephone: 785-368-8451

STATE OF MAINE
by Attorney General G. STEVEN ROWE
Christina Moylan
Assistant Attorney General
6 State House Station
Augusta, Maine 04333-0006
Telephone: 207-626-8800

STATE OF MARYLAND
by Attorney General DOUGLAS F. GANSLER
Ellen S. Cooper
Assistant Attorney General
Chief, Antitrust Division
Alan M. Barr
Assistant Attorney General
Deputy Chief, Antitrust Division

Schonette J. Walker
Assistant Attorney General
200 St. Paul Place, 19th Floor
Baltimore, Maryland 21202
Telephone: 410-576-6470

COMMONWEALTH OF MASSACHUSETTS
By Attorney General MARTHA COAKLEY
Mary B. Freeley
Madonna E. Cournoyer
Assistant Attorneys General
One Ashburton Place
Boston, MA 02108-1598
Telephone: 617-727-2200

STATE OF MICHIGAN
by Attorney General MICHAEL A. COX
M. Elizabeth Lippitt
Assistant Attorney General
Consumer Protection Division
Antitrust Section
Attorneys for the State of Michigan
G. Mennen Williams Building, 6th Floor
525 W. Ottawa Street
Lansing, Michigan 48913
Telephone: 517-335-0855

STATE OF MINNESOTA
by Attorney General LORI SWANSON
Matthew P. Reinsmoen
Assistant Attorney General
445 Minnesota Street, Suite 1200
St. Paul, Minnesota 55101-2130
Telephone: 651-215-1564

STATE OF MISSOURI
by Attorney General JEREMIAH (JAY) W. NIXON
Anne E. Schneider
Assistant Attorney General
Antitrust Counsel
P.O. Box 899
Jefferson City, Missouri 65102
Telephone: 573-751-8455

STATE OF NEVADA
by Attorney General CATHERINE CORTEZ MASTO

Eric Witkoski
Chief Deputy Attorney General and Consumer Advocate
Brian Armstrong
Senior Deputy Attorney General
555 E. Washington Avenue, Suite 3900
Las Vegas, Nevada 89701
Telephone: 702-486-3420

STATE OF NEW YORK
by Attorney General ANDREW M. CUOMO
Elinor Hoffman
Assistant Attorney General
Margaret Martin
Assistant Attorney General
Antitrust Bureau
New York State Department of Law
120 Broadway, Suite 26C
New York, New York 10271-0332
Telephone:  212-416-8269

STATE OF NORTH CAROLINA
by Attorney General ROY COOPER
Kimberley A. D'Arruda
Assistant Attorney General
Attorneys for the State of North Carolina
North Carolina Department of Justice
9001 Mail Service Center
Raleigh, North Carolina 27699-9001
Telephone:  919-716-6000

STATE OF OHIO
by Attorney General MARC E. DANN
Meghan K. Fowler
Assistant Attorney General
Doreen C. Johnson
Assistant Chief, Antitrust Section
150 East Gay Street, 20th Floor
Columbus, Ohio 43215
Telephone: 614-466-4328
Facsimile: 614-995-0266

STATE OF OREGON
by Attorney General HARDY MYERS
Tim D. Nord
Assistant Attorney General
Chin See Ming

Assistant Attorney General
Oregon Department of Justice
1162 Court Street NE
Salem, Oregon 97301-4096
Telephone: 503-934-4400

COMMONWEALTH OF PENNSYLVANIA
by Attorney General TOM CORBETT
James A. Donahue, III
Chief Deputy Attorney General
Joseph S. Betsko
Deputy Attorney General
Antitrust Section
14th Floor, Strawberry Square
Harrisburg, PA 17120
Telephone:  717-787-4530
Facsimile:  717-705-7110

STATE OF SOUTH CAROLINA
by Attorney General HENRY D. McMASTER
C. Havird Jones, Jr.
Senior Assistant Attorney General
P. O. Box 11549
Columbia, South Carolina 29211
Telephone: 803-734-3680

STATE OF TEXAS
by Attorney General GREG ABBOTT
Kent C. Sullivan
First Assistant Attorney General
Jeff L. Rose
Deputy Attorney General for Litigation
Mark Tobey
Chief, Antitrust & Civil Medicaid Fraud Division
William J. Shieber
Assistant Attorney General
Office of the Attorney General
300 W. 15th St., 9th Floor
Austin, Texas  78701
Telephone: 512-463-1710

STATE OF VERMONT
by Attorney General WILLIAM H. SORRELL
Julie Brill
Assistant Attorney General
Jennifer A. Giaimo

Assistant Attorney General
Attorneys for the State of Vermont
109 State Street
Montpelier, Vermont 05609-1001
Telephone: 802-828-5479

STATE OF WASHINGTON
by Attorney General ROB McKENNA
Mark O. Brevard
Assistant Attorney General
800 5th Avenue, Suite 2000
Seattle, Washington 98104-6338
Telephone: 206-464-7030
Facsimile: 206-464-6338

STATE OF WEST VIRGINIA
by Attorney General DARRELL V. McGRAW, JR.
Douglas Davis
Assistant Attorney General
Christopher Hedges
Assistant Attorney General
Consumer Protection and Antitrust Division
812 Quarrier Street
Charleston, West Virginia 25301
Telephone: 304-558-8986